2023 IL App (1st) 192479

SECOND DIVISION
June 30, 2023

No. 1-19-2479

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 16 CR 1024 |
| | ) | |
| RYNE DEGRAVE, | ) | Honorable |
| | ) | Lawrence E. Flood, |
| Defendant-Appellant. | ) | Judge Presiding |
| | ) | |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1    In August 2015, defendant Ryne Degrave and Victoria Meissner had plans to go to a spa together to commemorate the first anniversary of their marriage. Unfortunately, as had apparently happened too often before, things went sour. A day that should have been filled with celebration instead turned into one full of anger, culminating in a fight that left Meissner with a bloodied and broken nose. While she did not speak to police at first, about a month later, Meissner told them that defendant had punched her and tried to drown her. The State charged defendant with two counts of aggravated domestic battery.

¶ 2    The trial proceedings turned into a back catalog of their tumultuous relationship. The State introduced evidence that defendant had been violent toward Meissner before. In turn,

defendant also testified about several occasions where Meissner had attacked him to support his claim that *she* was the initial aggressor on their anniversary fight and that he was defending himself when he struck her. One such incident, which defendant captured on video, occurred in September 2015. But because that fight came *after* the argument that was the basis for the criminal charges, the trial court prohibited any reference to it and excluded the video. The court later convicted defendant of one count of aggravated domestic battery for breaking Meissner's nose but acquitted him of trying to drown her.

¶ 3     Defendant appeals, arguing that the evidence and video of the September fight was highly illustrative of Meissner's propensity to commit violence and may have bolstered his claim that she was the initial aggressor during the August fight. We agree. Evidence of a victim's purported violent character is admissible to prove that the victim was the initial aggressor. Here, the video and testimony about the September fight was highly probative of Meissner's violent character, and we find it of no import that this fight occurred after the one that prompted the State to charge defendant. The court misconstrued the law when it excluded this evidence, and because the evidence was closely balanced, we find plain error. We reverse the conviction and remand for a new trial.

¶ 4                                        BACKGROUND

¶ 5     The proceedings in this case reveal a relationship rife with allegations of violence committed by and against both parties. We recite this turbulent history because it became a key point in the trial and is important to the resolution of this appeal.

¶ 6     The State charged defendant with two separate counts of aggravated domestic battery for his role in a fight that occurred on August 23, 2015. Count I alleged that defendant struck

Meissner in the face and caused great bodily harm, breaking her nose. Count II accused defendant of strangling Meissner by holding her head underwater.

¶ 7    At trial, Meissner, who was born in Ukraine, testified that she moved to the United States in the early 2010s. In 2013, she met the defendant, and they dated for about a year before they got married on August 22, 2014. While they were married, they lived together in a condominium in the Chicago Loop.

¶ 8    In the very early morning hours of August 23, 2015, the defendant was at work tending bar while Meissner was at home by herself. They had plans to go to a spa together at 9 a.m. to celebrate their first wedding anniversary. The defendant got off work late; he came home after 4 a.m. the morning of the 23rd, and Meissner was asleep.

¶ 9                                      I. The State's Case

¶ 10    The State's case consisted of only Meissner and several stipulations, while the defendant was the only witness in his case. We detail their respective versions in depth.

¶ 11                                  A. Meissner's Testimony

¶ 12    Meissner testified that she woke up when defendant came home around 4 a.m. She said he did not want to go to sleep and told her that he wanted to go to the spa immediately. She said she was not feeling well and instead suggested they go back to sleep and go to the spa when they originally planned. The defendant then fell asleep next to her.

¶ 13    They woke up again sometime around 9 or 10 a.m. Defendant unilaterally decided to cancel their plans to go to the spa and left the condo a short while later. Meissner stayed home, assuming he would come back so they could celebrate their anniversary. Defendant returned home at around 3 in the afternoon with a bottle of wine, which he took onto the balcony and began to drink by himself. Meanwhile, Meissner was inside on the couch alone.

¶ 14     After about an hour, she went out to the balcony and asked the defendant to either go to the spa with her or go on a picnic to celebrate. Defendant refused; instead, he told her he was punishing her for being lazy and not going to the spa earlier. Meissner told him that she was not his daughter to punish.

¶ 15     This upset defendant. He moved toward her with a "crazed" look on his face. She backed into the living room, but he pursued her. As he got close, he struck her on her face and nose with his hand. Meissner heard her nose crack, her vision blacked out, and she fell backward onto the couch. She said she had not threatened or touched defendant before he hit her.

¶ 16     When her vision returned, Meissner realized she was on the floor, her nose bleeding so badly that she could not breathe. Eventually, she and defendant went into the bathroom to clean the blood, and the defendant filled the bathtub with water. Meissner, wearing one of defendant's shirts now covered with blood, got into the bathtub with defendant's help. He continued to yell at her, telling her it was her fault that she was bleeding. While they were washing off the blood, defendant threatened to hurt himself. He then put his hands over her ears, pushed her backward into the tub, and forced her head underwater. She could not breathe because her nose, mouth and face were fully submerged. The defendant held her there for between 40 and 60 seconds, while she struggled and tried to free herself. Eventually, he released her, and she could breathe again. Defendant told her that he could do anything to her and get away with it, then threatened her that if she reported the incident to the police, he had enough money to hire a good attorney.

¶ 17     After defendant left the apartment, Meissner sent text messages to friends, asking for a ride to the hospital. She took two photos of herself in her bathroom mirror, both of which were admitted into evidence. She testified that she took the photos immediately after the fight on August 23. They depict her bruised and bleeding from her nose, with blood on her face and shirt.

¶ 18    Two friends, Alex and Beth, were in town and agreed to take her to the hospital. Meissner changed her clothes and met them outside. They took her to Northwestern Memorial Hospital's emergency room, where Meissner initially told staff that she had taken a bad fall. She later told one of the doctors that defendant had hit her, and hospital staff called the police. But when the police arrived, Meissner refused to speak with them. She testified that she knew defendant was trying to get a law license and was afraid that if she reported him, it might prevent him from getting one. Meissner left the hospital and stayed the night with Alex and Beth.

¶ 19    The next day, Meissner contacted a doctor that she used to work with, and he put her in touch with a plastic surgeon who agreed to help her for free. She saw this doctor, had an MRI done, and later had surgery to fix a nasal fracture and reposition her nose.

¶ 20    Meissner was not a U.S. citizen. She was on a visa and had a green card. She acknowledged on cross-examination that a divorce from defendant might affect her status, though by the time of trial, she had petitioned for and received lawful permanent resident status under the Violence Against Women Act. She acknowledged that before she reported this incident to the police, defendant had indicated his desire for a divorce.

¶ 21                                B. Stipulations

¶ 22    In addition to Meissner's testimony, the parties stipulated to the testimony of various witnesses. First, Alex Vasileski would testify that, in August 2015, he was dating Beth Feiwell. On August 23, Feiwell received a message from Meissner, including a photo of her facial injuries. Meissner told Feiwell that defendant had beat her and broken her nose. Vasileski and Feiwell went to Meissner's apartment and drove her to Northwestern Memorial Hospital. Vasileski would further say that, after the doctor examined Meissner, he got upset that she did

not tell him how she was injured. Vasileski then told the doctor that defendant had punched and hit her in the face.

¶ 23     The parties also agreed that, if he had been called to the stand, Dr. Christopher Hogrefe would testify that he was a doctor at Northwestern Memorial Hospital. On August 23, 2015, he was in the emergency room when Meissner arrived. She initially told him she injured herself tripping and falling but later told him that she had been struck in the face. She refused to disclose who had struck her, however, and did not want to file a police report. Hogrefe noticed that Meissner had visible swelling to the right side of her face, bruising and discoloration of her eyes, and tenderness near the nasal bone. Hogrefe believed Meissner may have had a nasal or facial fracture and recommended Meissner have a CT scan, but she declined any treatment.

¶ 24     Finally, the parties stipulated that Dr. Maher Salahi would testify that he was a licensed physician in Illinois. On August 24, 2015, he was working at the University of Illinois Medical Center in Chicago when Meissner came to see him. She complained of facial pain and swelling from a trip and fall that happened the day before, Salahi would say. After a scan of her face, Salahi diagnosed her with a left nasal bone fracture, as well as soft-tissue swelling.

¶ 25                    C. Defendant's Previous Incidents of Domestic Violence

¶ 26     The State also introduced testimony about other times defendant had been violent to Meissner as evidence of his propensity to commit domestic violence. See 725 ILCS 5/115-7.4 (West 2018). At trial, Meissner claimed that defendant had been abusive toward her for about 18 months and that it was a regular occurrence in their relationship.

¶ 27     In September 2014, they had an argument at their condo that escalated into defendant strangling her. She lost consciousness, and when she came to, defendant was holding her hands, trying to hit himself in the face with them. Meissner thought defendant believed he had killed her

and that he was trying to make it look like self-defense. Though she had bruising on her neck, she did not go to the hospital or report the incident to police.

¶ 28    A month later, on Halloween, the couple had another argument that led to defendant hitting Meissner's head against their condo's hardwood floor. The defendant was so violent, she said, that she wrapped her hands around her head because she believed he would break her skull. She went to Cook County Hospital to be treated for a broken finger but did not tell hospital staff how she got injured, nor did she report the incident to police.

¶ 29    The next month, November 2014, she and defendant were in Green Bay, Wisconsin, together. They were visiting the defendant's parents' house because his father had recently committed suicide. Meissner said that, one night while they were sleeping, she woke up to the defendant strangling her to the point where she could not breathe. She was bruised but did not seek medical treatment or tell police about the incident.

¶ 30    And finally, in January 2015, defendant received a text message from an ex-girlfriend that prompted an argument. Meissner testified that she said something that triggered defendant so much that he hit her and then threw her into a closet door, she said. She was bruised but did not go to the hospital or call the police.

¶ 31                              II. The Defense Case

¶ 32                              A. Defendant's Testimony

¶ 33    Defendant testified to a significantly different version of what happened on August 23. At trial, he said that he was working last call at a bar that morning. After work, he rode a Divvy bike home, arriving at around 5 a.m. His wife was awake, he said, and he asked if they could go to the spa right away. Meissner told him she did not want to, and they both went to bed.

¶ 34    They woke up together at around 11 a.m., and defendant said he told Meissner he no longer wanted to go to the spa. This upset Meissner, so he left to go have his bicycle serviced at a nearby store. Defendant did not attach much importance to their marriage anniversary because nobody knew that they were married, and they had been to the spa before.

¶ 35    Despite his ambivalence about the occasion, he decided to pick up a bottle of wine and dinner from a restaurant as a peace offering. When he got back to the apartment at about 5 p.m., Meissner was in the shower. The defendant took the food and wine out to the balcony. He claimed that he did not drink any of the wine but did open the bottle to let it breathe.

¶ 36    About an hour later, Meissner came to the balcony. The defendant said she was upset because he was eating without her and kicked his feet, spat at him, then blew her nose on her hand and threw the snot at him. He got up, swore at her, and talked about getting a divorce. Meissner tried to get in his way as he tried to go inside from the balcony, and he muscled past her. She began to scream and shout that her husband was beating her, so he decided to leave.

¶ 37    As he began to move toward the condo's front door, which was at the end of a 20- to 30-foot hallway, Meissner jumped onto his back, pulling at his shirt and screaming for him to stay. When he reached for the door with his right arm, he felt her grab the back of his neck with her right arm. He began to struggle to breathe; he threw his right elbow back to try to get her off. She fell off his back, and he left the apartment. Defendant did not look behind when he left, nor did he check to see if he had struck Meissner.

¶ 38    Defendant said he stayed away from the apartment for two or three hours, mostly hanging out in the lounge of a hotel across the street from their apartment. Meissner repeatedly called defendant, he said, but he blocked her number. When he went back home later that night, nobody

was there; the lights were turned off, and he did not see any blood in the apartment. Meissner came home the next day, he said, and he assumed she had spent the night with friends.

¶ 39    Throughout September, defendant told Meissner he wanted a divorce and filed for one on September 30, 2015. Six days later, October 6, he was arrested for the domestic battery at issue.

¶ 40                    B. Defense Evidence of Meissner's Violent Tendencies

¶ 41    Defendant also sought to introduce evidence that Meissner had been violent toward him to bolster his theory that she was the initial aggressor, and he was defending himself. Before trial, he argued that his proffered incidents would provide "insight into the defendant's state of mind" and "corroborate the defendant's testimony that Meissner was the initial aggressor[.]"

¶ 42    The court allowed defendant to testify about three incidents: (1) On December 31, 2014, Meissner and the defendant got into a fight, and Meissner threw items at him; (2) On January 1, 2015, Meissner pushed the defendant while he was in the shower during an argument; and (3) on either February 7 or 8, 2015, Meissner threw items, pushed, and hit the defendant during another dispute. The defendant detailed those incidents at trial.

¶ 43                    C. September 27, 2015 Incident and Video

¶ 44    Of particular relevance to this appeal: Before trial, in addition to the other-acts evidence listed above, defendant sought to admit evidence of a fight he and Meissner had on September 27, 2015, approximately one month *after* the fight that formed the basis for the charges in this case (which took place on August 23, 2015). In his proffer to the court before trial, defendant alleged that the September 27 fight was relevant because it was "almost identical" to the August 23 fight. Meissner and defendant got into an argument, then Meissner attacked defendant first. She jumped on his back, tried to choke him with her forearm, and tore his shirt. (As it will

become the centerpiece of this appeal, we will refer to this incident as the "September 27 fight" and the video depicting it as the "September 27 video.")

¶ 45    Defendant captured the September 27 fight on a series of videos, taken from his cell phone. The videos (there are multiple files, but all seem to depict one continuous sequence) show Meissner and defendant engaged in a heated argument. Meissner can be seen frequently yelling and shouting at defendant, accusing him of deleting "evidence" from her phone, among other allegations. Defendant, who is holding the phone and pointing the camera back at himself and Meissner, denies her accusations. Meissner follows defendant around their apartment, continuing to confront him. Eventually, she can be seen jumping onto defendant's back and placing her arm across his chest and throat. Later in the video, defendant's shirt is visibly torn, and he has bloody scratches on his chest. Defendant does not appear to ever strike or use force against Meissner on the video.

¶ 46    The State argued that the September 27 fight was inadmissible because it was "nothing that would have played into the defendant's mindset at the time of this incident." The trial court agreed and barred admission of any testimony regarding, or of the video depicting, the altercation. In doing so, the court said that, since the September 27 fight was "post the occurrence" of the charged domestic battery, "it certainly couldn't go to [the defendant's] state of mind at the time that the incident that's the subject of the litigation occurred."

¶ 47    After a bench trial, the court found defendant guilty of one count of aggravated domestic battery for striking Meissner in the face but not guilty of strangling her in the bathtub. It later sentenced defendant to two years of probation and 60 days of jail, the latter which was satisfied by credit for time spent on electronic monitoring.

¶ 48 Defendant now appeals. In our review of the appeal, we discovered that the September 27 video was not initially in the record. The record shows, however, that the trial court reviewed it before denying its admission into evidence. We determined that a viewing of this video was "important to a correct decision of this appeal" and thus, under Illinois Supreme Court 363 (eff. Feb. 1, 1994), ordered that the record be supplemented to include this video.

¶ 49                                           ANALYSIS

¶ 50 On appeal, the defendant raises one issue: the trial court erred by refusing to allow evidence (especially the video) of the September 27 fight between himself and Meissner, even though that fight occurred after the August 23 incident that gave rise to the charges. He claims that the September 27 fight and video was highly probative of Meissner's propensity for violence and violent or aggressive temper, which would have supported his claim that she was the initial aggressor in the August fight.

¶ 51 Defendant has forfeited this claim. To preserve an error for appellate review, the defendant must challenge the error at trial and raise it in a post-trial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. Here, defendant moved before trial to admit the evidence but failed to include any claim of error on this point in his post-trial motion. But we may excuse his forfeiture if he establishes that the error is "plain." *Id.*; Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).

¶ 52 The plain-error doctrine is a narrow exception to the rule that unpreserved errors are not reviewable. *People v. Jackson*, 2020 IL 124112, ¶ 81. If we conclude that an error, in fact, occurred, we will grant relief to a defendant if the evidence was so closely balanced that the error may have tipped the balance toward a guilty a verdict, or if the error is so serious that the defendant was denied a substantial right. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005).

¶ 53    The first step is to determine if there was an error at all. *People v. Williams*, 2022 IL 126918, ¶ 49. The error must be clear and obvious. *Id.* Alleged evidentiary errors are reviewed for an abuse of discretion. *People v. Reid*, 179 Ill. 2d 297, 313 (1997). A court abuses its discretion when no reasonable person would take the view adopted by the court or when the court commits legal error. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991); *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 80.

¶ 54                                              I

¶ 55    Long before the adoption of the Illinois Rules of Evidence, in the well-known decision of *People v. Lynch*, 104 Ill. 2d 194, 200 (1984), our supreme court held that, when a defendant alleges self-defense, a victim's aggressive and violent character may be relevant to show who was the initial aggressor. This evidence may be relevant for one of two reasons.

¶ 56    Under the first *Lynch* basis, evidence of the alleged victim's violent history is admissible to explain the defendant's perceptions of the victim's behavior at the time in question. *Id*. The reasonableness of the defendant's actions vis-à-vis the alleged victim might be cast in a different light if the defendant knew of the victim's proclivity toward violence. *Id*. Quite obviously, defendant would have to have preexisting knowledge of the victim's violent tendencies for this to be relevant. *Id*. And here, of course, defendant could not possibly have known of a violent attack that had not yet happened—the September 27 fight took place a month after the August 23 altercation in question. So this first basis for *Lynch* admissibility could not possibly apply.

¶ 57    But the second *Lynch* basis is altogether different. There, "evidence of the victim's propensity for violence tends to support the defendant's version of the facts where there are conflicting accounts of what happened." *Id.* The law ordinarily frowns on propensity evidence— the notion that if you did something on one occasion, it is more likely that you did the same or

similar thing on another occasion, too. But the law makes exceptions to this doctrine, one of which is the second basis for admissibility under *Lynch*. In a self-defense case, evidence of the alleged victim's propensity for violence—via prior acts of violence—is relevant because, if the victim was violent on another occasion, it makes it more likely that the victim was the aggressor on the occasion in question. *Id*. And in that instance, obviously, it makes no difference whether the defendant *knew* of these prior acts of violence. *Id*. (under second basis for admissibility, "whether the defendant knew of this evidence at the time of the event is irrelevant.").

¶ 58    The court here ruled that evidence of the September 27 fight and the related video was not admissible because it "couldn't go to the state of mind at the time that the incident" occurred. For reasons we have just discussed, that was surely a correct reason to deny admissibility of the testimony and video based on the *first* basis for admissibility under *Lynch*, as defendant could not have known, on August 23, of a violent incident that did not occur until September 27. But the court's reasoning would not apply to the *second* basis for admissibility, which is not concerned in any way with the defendant's knowledge or state of mind.

¶ 59    Still, we review the court's judgment, not its reasoning; if the judgment was ultimately correct, we will affirm even if we disagree with the court's reasoning. *People v. Martinez*, 2021 IL App (1st) 182553, ¶ 37. So the question is whether evidence of the September 27 fight, both testimonial and video, satisfied the second *Lynch* basis for admissibility—or, more specifically now, whether this evidence satisfied the Illinois Rules of Evidence, which were adopted in 2011 and which codified many preexisting common-law evidentiary holdings, including *Lynch*.

¶ 60    The second basis for admissibility under *Lynch* is found in Rule 405(b)(2) of the Illinois Rules of Evidence. See Ill. R. Evid. 405(b)(2) (eff. Jan. 1, 2011); *Martinez*, 2021 IL App (1st) 182553, ¶ 35. That rule reads:

"In criminal homicide or battery cases when the accused raises the theory of self-defense and there is conflicting evidence as to whether the alleged victim was the aggressor, proof may also be made of specific instances of the *alleged victim's prior violent conduct*." (Emphasis added.) Ill. R. Evid. 405(b)(2) (eff. Jan. 1, 2011).

¶ 61    The parties do not dispute that most of this rule fits this case. This is a battery case where defendant is raising self-defense, and there is conflicting evidence as to who was the aggressor. The battle joins at the italicized phrase at the end—"the alleged victim's prior violent conduct." *Id*. Does that phrase mean violent conduct that occurred "prior" to the events giving rise to the charges (here, August 23), or does it mean violent conduct that occurred at any time "prior" to *trial*? For obvious reasons, this interpretation will make or break defendant's legal argument.

¶ 62    The appellate courts have reached different conclusions. In *People v. Figueroa*, 381 Ill. App. 3d 828, 847 (2008), the appellate court for the First District wrote that "[d]efendant is correct that evidence of incidents of violence that postdate the crime for which a defendant is being tried may be admissible under the second *Lynch* approach to determine who was the aggressor." In that case, however, the court found that the defendant failed to present any disputed question as to who the aggressor was—recall that this is a prerequisite in Rule 405(b)(2)—and thus had no need to decide that question definitively. *Id*. at 847-48.

¶ 63    The same was true in *People v. Ciavirelli*, 262 Ill. App. 3d 966, 972 (1994), where another appellate panel in the First District wrote that "reliable evidence of incidents of violence, including those which postdated the shooting, might still have been relevant under the second prong of the analysis in *Lynch* to support defendant's contentions as to who was the aggressor where there are conflicting accounts of what happened." In that case as well, the defendant failed

to present any dispute as to who the aggressor was, so the evidence was properly denied on that ground. *Id*. at 972-73.

¶ 64   In contrast, an appellate court for the Fourth District held that evidence of the alleged victim's violent conduct that postdated the incident in question was *not* admissible under the second *Lynch* ground for admissibility. See *People v. Evans*, 2018 IL App (4th) 160686, ¶ 30. The court noted that *Lynch*, itself, concerned evidence of battery convictions prior to the charged offense and noted that the defendant had "provided this court with no authority supporting its expansion of the supreme court's holding in *Lynch*." *Id*. Apparently, the defendant did not cite *Ciavirelli* or *Figueroa*, both of which predated *Evans*, but neither of which made its way into the court's brief discussion in *Evans*.

¶ 65   Notably, the defendant in *Evans* also had video evidence of the alleged victim's violent incident, and perhaps more notably still, the State *conceded* that the video evidence should have been admitted under *Lynch*'s second basis. *Id*. ¶ 31. But the Fourth District "d[id] not accept the State's concession," because "[l]ike defendant, the State failed to address the fact the alleged incident on the phone video *** occurred after the charged incident in this case." *Id*.

¶ 66   So the courts are split. The State would note that *Evans* was a direct holding, while the reasoning in the First District cases of *Ciavirelli* and *Figueroa* were not necessary to their holdings and were thus *dicta*.  True, but we find it notable that *Evans* did not so much as mention these earlier First District cases—apparently they were not brought to the court's attention—and believed that no decision had ever so much as commented on the question. And even the State conceded in *Evans* that video evidence of the violent conduct that postdated the charged offense should have been admitted under the second *Lynch* theory of admissibility. Overall, it is fair to

say that, other than noting that the defendant had not cited any authority for its position, the reasoning in *Evans* was somewhat abrupt.

¶ 67  That is not necessarily to say that *Evans* was incorrectly decided, but it is certainly enough to give us pause.  So we will proceed with our own interpretation of this rule of evidence, a question of law we review *de novo*. *People v. Deroo*, 2022 IL 126120, ¶ 19. We interpret the Illinois Rules of Evidence as we would a statute. *Id*. We give effect to the intent of the drafters, the most reliable indicator of which is the plain and ordinary meaning of the language used. *Id*.

¶ 68  But we do not isolate language in a rule; we must read it in context with other like provisions, particularly those that cover similar topics. *Board of Education of City of Chicago v. Moore*, 2021 IL 125785, ¶ 20; *Collinsville Community Unit School District No. 10 v. Regional Board of School Trustees of St. Clair County*, 218 Ill. 2d 175, 185–86 (2006). We also consider "the reason for the law, the problems sought to be remedied, the purposes to be achieved, and the consequences of construing the statute one way or another." *Moore*, 2021 IL 125785, ¶ 20.

¶ 69  To reiterate, the question is what Rule 405(b)(2) means when it refers to the "alleged victim's prior violent conduct." Ill. R. Evid. 405(b)(2) (eff. Jan. 1, 2011). Does it mean only violent conduct that predated the incident in question on August 23, or does it include any violent conduct up to the moment of its introduction at trial?

¶ 70  We would first make the obvious point that the word "prior" is not otherwise modified. The rule does not elaborate on whether the alleged victim's violent conduct must have occurred "prior" to the event in question or simply "prior" to the evidence being presented at trial. One could reasonably argue that the word "prior," without elaboration, means nothing more than the obvious point that *any* evidence of an incident that is introduced at trial must have occurred at *some* point before that trial.

¶ 71    Fortunately, the topic of propensity evidence is not limited to Rule 405(b)(2) in the rules. As we noted previously, the law generally disfavors propensity evidence; we generally reject the notion that we can prove that an individual performed an act on the occasion in question because he or she performed the same or similar act on a different occasion. We reject that notion not because it lacks probative value but because it has " 'too much probative value' "—we fear it will be given too much weight by the factfinder—and is thus viewed as inherently prejudicial. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) (quoting *People v. Manning*, 182 Ill. 2d 193, 213 (1998)); see *People v. Watts*, 2022 IL App (4th) 210590, ¶ 39.

¶ 72    The general rule against propensity evidence is found in Rule 404(a) of the rules, which provides that, subject to enumerated exceptions, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion ***." Ill. R. Evid. 404(a) (eff. Jan. 1, 2011). But one exception to that rule, in particular, is notable here, found in Rule 404(b):

> "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith except as provided by sections 115-7.3, 115-7.4, and 115-20 of the Code of Criminal Procedure (citations)." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011).

¶ 73    Note that Rule 404(b) does not use the word "prior." It refers to "*other* crimes, wrongs, or acts," which would not reasonably lend itself to any temporal limitation whatsoever. And as we will show below, the three statutes incorporated into Rule 404(b) by reference do not appear to have such a temporal limitation, either.

¶ 74    One of the statutes referenced in Rule 404(b), quite similar to the language in Rule 405(b)(2) but related to the other side of a domestic-violence prosecution—indeed, a statute on

which the State relied at trial here to introduce evidence against defendant—is section 115-7.4 of the Code of Criminal Procedure. See 725 ILCS 5/115-7.4(a) (West 2022). That statute provides that in a prosecution for domestic violence, "evidence of the defendant's commission of *another* offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant." (Emphasis added.) *Id*. Note that the statute refers to the commission of "another" offense, much like the "other" acts in Rule 404(b), as opposed to the "prior violent conduct" in Rule 405(b)(2). Like "other," the word "another" in section 115-7.4 does not admit of any temporal limitation whatsoever. It is hard to see how anyone could claim that section 115-7.4 distinguishes at all between evidence of domestic violence that occurs before the charged offense versus afterward.

¶ 75    The same is true of another statute incorporated into Rule 404(b), section 115-7.3 of the Code of Criminal Procedure, which is all but identical to section 115-7.4—but instead of allowing evidence of "another offense or offenses" of the defendant's *domestic violence*, it allows evidence of "another offense or offenses" of the defendant's *sexual abuse*. 725 ILCS 5/115-7.3 (West 2022); see *People v. Dabbs*, 396 Ill. App. 3d 622, 625 (2009), *aff'd*, 239 Ill. 2d 277 (2010) (sections 115-7.3 and 115-7.4 are "nearly identical," only differing in that former "deals with prior incidents of sexual abuse" and latter covers those "of domestic violence").

¶ 76    The final statute referenced in Rule 404(b) allows for the admission of "[e]vidence of a prior conviction of a defendant for domestic battery [or related offenses] *** in a later criminal prosecution for any of these types of offenses ***." 725 ILCS 5/115-20 (West 2022). That statute references a "prior conviction" but clarifies that this "prior conviction" may be used in a "later criminal prosecution." *Id*. It seems rather clear that the point here is to differentiate between convictions that are part of a current prosecution and those that predate the current

prosecution. We read nothing in that language suggesting that the "prior conviction" must have occurred prior to the events that form the current charged offense.

¶ 77     To summarize: the language used in Rule 404(b) (referring to "other" acts), and the statutes incorporated into Rule 404(b) that allow other-act evidence to show a defendant's propensity, all would appear to *not* have a temporal limitation. They all appear to allow evidence of a defendant's other, similar criminal acts for the purpose of showing the defendant's propensity *regardless* of whether those other acts predate or postdate the incident in question.

¶ 78     It would be reasonable for the State to argue, then, that the use of the word "prior" in Rule 405(b)(2) was intended to reach a different result compared to the language employed in Rule 404(b) and its incorporated statutes—the intent was to impose a temporal limitation in Rule 405(b)(2). See *Emerald Casino, Inc. v. Illinois Gaming Board*, 346 Ill. App. 3d 18, 35 (2003) (when statute uses different language to cover similar topics, court may infer that legislature intended different result). And thus it would follow that Rule 405(b)(2) limits evidence of the alleged victim's prior acts of violence to those acts that predate the charged incident.

¶ 79     While that position is not unreasonable, we do not think it is correct, as it would be inconsistent with the reasoning and spirit of *Lynch*, the very decision on which Rule 405(b)(2) was based.

¶ 80     In *Lynch*, 104 Ill. 2d at 200, the supreme court wrote: "We hold that when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it." Elsewhere, the supreme court wrote: "Convictions for crimes of violence, such as [the victim's] three convictions for battery, are reasonably reliable evidence of a violent character." *Id*. at 201. And finally, this: "[E]vidence of the victim's propensity for violence tends

to support the defendant's version of the facts where there are conflicting accounts of what happened." *Id*. at 200.

¶ 81    Missing from all this discussion in *Lynch* is any hint that there is a timing element regarding the character evidence. And that is because, in our view, there is no reason why there should be. Though the victim's "aggressive and violent character" (*id*.) is typically demonstrated by acts—specific instances of violent conduct—we should not lose sight of the fact that we are talking about character evidence. A propensity for aggressiveness or violence is a character trait. One's character is revealed by one's actions, but there is no particular reason why that person's character would be revealed more or less, depending on whether the acts revealing this character took place before or after the charged incident.

¶ 82    Take a simple example. Individual A is accused of stealing from the petty cash fund at work on January 10. Suppose we have evidence that he was caught stealing from the petty cash fund a week later, on January 17. Does that January 17 theft tend to suggest a character trait— that Individual A has a propensity to steal—that makes it more likely that he did so on January 10, as well?  Of course it does. It is the fact that Individual A stole on another occasion, not whether that particular occasion took place before or after January 10, that matters.

¶ 83    True, the law generally does not allow this character evidence for propensity—it would not in the above example—but in those rare instances where such character evidence to prove propensity is allowed, such as in Rule 405(b)(2) regarding domestic-battery cases, it should not matter whether those illustrative acts took place before or after the events giving rise to the current charge.

¶ 84    To this we would add that if, as it appears from our earlier discussion, Rule 404(b) and the statute it incorporates, section 115-7.4, permit the *State* to introduce evidence of a

defendant's prior acts of domestic violence regardless of whether those acts predate or postdate the incident in question, it would be gravely unfair to give a defendant—possessive of constitutional rights to a fair trial and to present a defense—only half of that same right.

¶ 85    And doing so would stand *Lynch* on its head. For context, the 1984 decision in *Lynch* was handed down 23 years before section 115-7.4 became law in 2007. See Pub. Act 95-0360, Ill. Gen. Assembly, § 5 (eff. Aug. 23, 2007) (adding 725 ILCS 5/115-7.4). At the time *Lynch* was decided, the State was not permitted to introduce prior acts of the *defendant's* domestic violence to show propensity, for the very same reason that propensity evidence was generally inadmissible—because it was deemed overly prejudicial. The supreme court recognized as much but was still moved to adopt the rule that evidence of the *alleged victim*'s domestic violence could be admitted—the reason being that defendants, unlike the State, have constitutional rights at stake:

> "Convictions for crimes of violence, such as [the alleged victim's] three convictions for battery, are reasonably reliable evidence of a violent character. Such evidence is ordinarily inadmissible *against a defendant* for the purpose of proving the offense charged, because the danger of prejudice outweighs the relevance of the evidence *where the defendant stands to lose his liberty or even his life if convicted*. Where the *victim's* propensity for violence is in question, however, the danger of prejudice to the defendant lies in *refusing* to admit such evidence, while its high degree of relevance and reliability remains constant." (Emphases added.) *Lynch*, 104 Ill. 2d at 201.

¶ 86    In other words, the supreme court was willing to allow evidence that the law otherwise deemed prejudicial and inadmissible because of the importance of the defendant's constitutional rights. With that in mind, we find it all but impossible to believe that the supreme court, in

adopting Rule 405(b)(2), intended to give *less* rights to criminal defendants to present their case than the State would receive in a homicide or battery case under section 115-7.4.

¶ 87    We thus hold that Rule 405(b)(2) and *Lynch* permit evidence of "specific instances of the alleged victim's prior violent conduct" regardless of whether those specific instances occurred before or after the incident in question. We decline to follow the Fourth District's decision in *Evans*, 2018 IL App (4th) 160686, that held otherwise.

¶ 88    The trial court erred in determining that this evidence was inadmissible on the basis that it occurred after, not before, the August 23 incident in question. But of course, even if the evidence was admissible under Rule 405(b)(2), it does not automatically follow that a court must admit it in all instances. The court still retains the right to consider whether the prejudicial value of the evidence substantially outweighs its probative value, whether the evidence is overly cumulative, or whether other issues of undue delay or inefficiency counsel against admission. See Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 89    Here, however, we nevertheless find an abuse of discretion in the refusal to admit evidence of the September 27 fight, including most notably the video evidence. True, the court had allowed other evidence of Meissner's domestic violence toward defendant, but the court heard more other-act evidence of domestic violence committed by defendant, offered by the State, than the other way around. This is not a game of pure numbers, of course, but in our view, the tipping point is that the September 27 video was particularly helpful among defendant's evidence of Meissner's prior domestic violence.

¶ 90    For one thing, the facts depicted in the September 27 video bore a startling similarity to defendant's version of what happened on August 23. At one point of the video, one can see Meissner jump onto the defendant's back and put her arm around his neck. When she does, her

head is clearly visible near the defendant's arm. Later in the video, she can be seen attacking him again, tearing his t-shirt and leaving bloodied scratches on his chest. What happened on camera on September 27 is essentially what defendant claimed happened on August 23. And second, the September 27 video stood alone among the evidence presented, both of the August 23 incident at issue and the other-act evidence put forward by each side, in that it was visual proof and not he-said, she-said testimony.

¶ 91　　We thus find an abuse of discretion in the refusal to admit evidence of the September 27 fight and, in particular, the September 27 video.

¶ 92　　　　　　　　　　　　　　　　II

¶ 93　　Having determined that error occurred, we must determine whether it was "plain error." Defendant argues that he has established first-prong plain error—that the evidence was closely balanced, and the error tipped the scales toward a guilty verdict. *Herron*, 215 Ill. 2d at 178; *Sebby*, 2017 IL 119445, ¶ 51. This is more than just determining if the evidence in the case is closely balanced; the error itself must be prejudicial and have had some probable bearing on the result. *Williams*, 2022 IL 125918, ¶ 57.

¶ 94　　" 'When error occurs in a close case, we will opt to "err on the side of fairness, so as not to convict an innocent person." ' " *People v. Naylor*, 229 Ill. 2d 584, 605–06 (2008) (quoting *People v. Piatkowski,* 225 Ill. 2d 551, 566 (2007), quoting *Herron,* 215 Ill. 2d at 193). We likewise err on this side under the facts of this case and find that plain error occurred.

¶ 95　　The State's evidence was certainly sufficient to establish guilt, but defendant's evidence was strong, as well. At bottom, this case was almost entirely a battle of credibility between Meissner and defendant, each of whom had a history of violence against the other. See *Naylor*, 229 Ill. 2d at 606-07 (finding evidence closely balanced, as it presented "credibility contest"

between witnesses); *People v. Jackson*, 2012 IL App (1st) 102035, ¶ 17 (generally, "[w]here judgment rests solely on the credibility of witnesses at trial, the evidence is closely balanced.").

¶ 96    Both defendant's and Meissner's versions of the August 23 incident were plausible. Each had a motive to testify falsely—defendant to avoid conviction, Meissner to protect her immigration status. Each accused the other of, at one time or another, attempting to falsify evidence against the other.

¶ 97    True, Meissner's account of events was corroborated by her facial injuries, but those injuries are consistent with defendant's claim of self-defense, whereby he threw back his elbow to fight off Meissner as she jumped on his back and wrapped her arm around his neck. That is, defendant never denied striking her face; he just claimed legal justification for doing so.

¶ 98    At bottom, we do not pretend to know the truth, but there is no question that the evidence was close, and visual evidence via the September 27 video that bore a striking similarity to defendant's version of the August 23 incident could well have made a difference in the outcome of the trial.

¶ 99    We thus find that plain error occurred in the refusal to admit evidence of the September 27 fight, including the September 27 video.

¶ 100                              CONCLUSION

¶ 101   Defendant's conviction is reversed. The cause is remanded for a new trial.

¶ 102   Reversed and remanded.

---

***People v. Degrave*, 2023 IL App (1st) 192479**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16 CR 1024; the Hon. Lawrence E. Flood, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Benjamin Wimmer, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Sara McGann, and Andrew D. Yassan, Assistant State's Attorneys, of counsel), for the People. |

---