2023 IL App (2d) 220459-U
No. 2-22-0459
Order filed November 14, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 09-CF-361 |
| TONY ROSALEZ, | ) ) | Honorable Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices Jorgensen and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court did not commit manifest error when it denied defendant's postconviction petition following a third stage evidentiary hearing in which it evaluated the testimony and credibility of the recanting witnesses.

¶ 2    Defendant, Tony Rosalez, was convicted of the first-degree murder (720 ILCS 5/9-1(a)(1) (West 2008)) of Paola Rodriguez and was sentenced to a 35-year term of imprisonment which was affirmed on direct appeal (*People v. Rosalez*, 2016 IL App (2d) 140431-U (*Rosalez I*)). In October 2017, defendant filed a postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). In his petition, defendant claimed, relevantly, that newly discovered evidence—in the form of several recanting witnesses—entitled him to relief. In August

2019, the circuit court of Kane County dismissed the petition at the second stage, and defendant appealed. In *People v. Rosalez*, 2021 IL App (2d) 200086 (*Rosalez II*), we reversed and remanded the cause for a third stage evidentiary hearing. Following the third stage evidentiary hearing, the trial court denied defendant's postconviction petition, and defendant appeals that judgment. On appeal, defendant contends that the trial court committed manifest error by improperly rejecting the credibility of the testifying witnesses because it relied on its personal beliefs about how gang members behave; by improperly evaluating their testimony; and by evaluating the newly discovered evidence using an improper standard. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        We summarize the relevant facts appearing in the record. On January 30, 2009, Rodriguez was slain while she was driving her green Pontiac Grand Prix in Elgin. In February 2009, defendant was charged with Rodriguez's murder. In 2010, two codefendants entered into plea agreements with the State: Manith Vilayhong and Raul Perez-Gonzalez. Vilayhong was a "governor" of the Maniac Latin Disciples street gang, and he admitted that he ordered defendant to shoot while he was riding in the white Ford Expedition from which the fatal shot was fired. Perez-Gonzalez admitted driving the Expedition and to following Vilayhong's directions about where to drive during the incident. In each codefendant's plea agreement, they agreed to plead guilty to first-degree murder and to receive a 35-year sentence which would be reduced to a 20-year sentence in exchange for their truthful testimony at any prosecutions arising out of the Rodriguez murder.

¶ 5        Before the commencement of defendant's trial, Perez-Gonzalez refused to testify at defendant's trial, breaking his plea agreement. Perez-Gonzalez was advised that, if he persisted in refusing to testify, he would receive a 35-year sentence. Perez-Gonzalez continued to refuse to testify. Perez-Gonzalez subsequently was found to be in direct contempt of court for his refusal

to abide by the terms of his plea agreement and to testify in defendant's trial, and he was sentenced to a 10-year term of imprisonment for contempt, to be served consecutively with his 35-year sentence for murder, for an aggregate term of imprisonment of 45 years.

¶ 6                          A. Defendant's Jury Trial

¶ 7      In 2012, the case against defendant advanced to a jury trial. Sara Almanza testified that, on the evening of January 30, 2009, she met her cousin, Rodriguez, at her house in Elgin. Rodriguez was with Omar Zavala, Almanza's then-boyfriend, and Zavala's friend, Alvaro. They met to go to a mutual friend's birthday party, but the group split up with Almanza and Rodriguez running errands in Rodriguez's Grand Prix, and Zavala and Alvaro driving Almanza's truck, a Dodge Durango. Around 9 p.m., Almanza and Rodriguez arranged to meet Zavala and Alvaro at a McDonald's restaurant located near Bluff City Boulevard in Elgin. The group was at a nearby gas station, outside of their vehicles, when a white Ford Expedition drove by. Someone from the Expedition shouted at the group, and Zavala shouted a gang slogan at the Expedition, "Maniac killer."

¶ 8      Almanza testified that she and Rodriguez got into the Grand Prix with Rodriguez driving, and Zavala and Alvaro were in Almanza's Durango, and they drove out of the gas station. The Expedition followed the group and, eventually, pulled alongside the Grand Prix. Almanza heard a gunshot, and the front driver's side window shattered. Almanza observed a flash as this happened and noted that the front passenger's side window of the Expedition was open, but she did not believe that the back passenger's side window was open. Rodriguez was struck and slumped over the steering wheel. Almanza stepped on the brakes to stop the car. Almanza acknowledged that she did not see the person who shot Rodriguez.

¶ 9      Vilayhong testified that in 2009, he was a "governor" of the Maniac Latin Disciples, explaining that his position in the gang hierarchy meant that his instructions to lower ranking gang

members had to be obeyed. On the evening of January 30, 2009, Vilayhong, defendant, Jose Gonzalez, Jose Pellot, and Perez-Gonzalez were driving in a white Ford Expedition. They stopped at a convenience store to purchase beer. Vilayhong and defendant entered the store and bought the beer. When they returned to the Expedition, defendant got into the front passenger seat and Vilayhong got into the seat behind defendant. Vilayhong noticed possible rival gang members in the gas station across the street, and he ordered Perez-Gonzalez to drive closer to investigate. Vilayhong recognized that the men (Zavala and Alvaro) were members of the Insane Deuces street gang and began taunting them with gang slogans. The other occupants of the Expedition did not participate. Zavala and Alvaro countered with their own gang slogans.

¶ 10 Vilayhong instructed Perez-Gonzalez to follow the two cars. As the pursuit ensued, Vilayhong ordered defendant to "shoot 'em," and threatened defendant with a gang violation if he did not shoot. Defendant initially refused to comply, and Vilayhong ordered defendant to give him the gun. Defendant still refused to comply. Vilayhong leaned out of his window and continued to yell gang slogans—he believed that, at the same time, defendant was leaning out of the front passenger window or had his arm outside the car. Vilayhong testified that, when the people in the Grand Prix did not respond to his taunts, he realized that they were not gang members. At that moment, Vilayhong heard a gunshot.

¶ 11 After the shot was fired, the group dropped off defendant near his home. Vilayhong told Perez-Gonzalez to drive to a car wash in Bolingbrook to remove gunshot residue and any other evidence from the Expedition. After washing the car, Vilayhong called a friend, Andres Garza, to come and give him a ride home.

¶ 12 Vilayhong was inconsistent discussing the gun used in the shooting. On direct examination, he testified that, about 20 to 30 minutes before the group arrived at the convenience store, he gave the gun to the defendant, and he did not know what happened to the gun after the

shooting. On cross-examination, Vilayhong testified that, several weeks before the shooting, he had given the gun to defendant. Vilayhong was confronted during cross-examination about the discrepancy in his testimony, and he maintained that he had given the gun to defendant on the day of the shooting. Regarding the disposal of the weapon, on cross-examination, Vilayhong testified that he thought he gave the gun to Garza for disposal.

¶ 13 Vilayhong also testified about his mental health, acknowledging that, in 2002, he had been hospitalized for bipolar disorder and anger and aggression issues. When he was released from the hospital, he ceased taking his prescribed medications and had not resumed taking them thereafter.

¶ 14 Vilayhong testified that he had entered into a plea agreement with the State. Vilayhong explained that he pleaded guilty to first-degree murder in exchange for a 35-year sentence, but the sentence would be reduced to a 20-year term if he testified truthfully. Vilayhong also noted that he was relieved not to be facing the "shooter spot."

¶ 15 Gonzalez, one of the occupants of the Expedition, testified that, at the time of the shooting, he was a member of the Spanish Cobras street gang. Gonzalez knew that Vilayhong and defendant were members of the Maniac Latin Disciples street gang, but neither of the other occupants, Perez-Gonzalez nor Pellot, were members of any street gang.

¶ 16 Gonzalez testified that he was seated next to Vilayhong, and he noted that Vilayhong became agitated and angry when he noticed rival gang members at the gas station across the street. Vilayhong told the group that they should "jump out" on the rival gang members, and he instructed the driver, Perez-Gonzalez, to pursue their vehicles. Vilayhong leaned out of the rear passenger-side window, gesturing gang signs and shouting gang slogans at the supposed rival gang members. Vilayhong ordered Perez-Gonzalez to pull alongside the Grand Prix, and he told defendant that he "better do it," which Gonzalez understood to mean that defendant was ordered to shoot at the rival gang members. Gonzalez observed defendant, who was sitting in the front passenger-side seat,

lower his window and stick his arm out of the window. Gonzalez then saw a flash and heard a gunshot come from the vicinity of defendant's window. After the shooting, the group dropped defendant off near defendant's home. Gonzalez did not observe that defendant gave anyone the gun before he left. The group then proceeded to a car wash.

¶ 17    During cross-examination, Gonzalez described that Vilayhong was "running the show" and was the only one of the group gesturing and yelling gang slogans at the rival gang members. Gonzalez's testimony about the position of Vilayhong's window was not consistent. First, he testified that Vilayhong's window was down during the entire encounter. Later, Gonzalez testified that Vilayhong's window was up when they drew even with the Grand Prix. Gonzalez also acknowledged that he had not told police that Vilayhong's window was up at the time of the shooting. Gonzalez additionally stated that, even though the window was tinted he was able to see that defendant had thrust his arm out of the front passenger's-side window, and he observed a flash when he heard the gunshot.

¶ 18    Gonzalez acknowledged on cross-examination that, when he was initially interviewed by the police, he had denied that he was in the Expedition. When Gonzalez admitted that he was present in the Expedition, he did not mention that Pellot was also in the vehicle because Pellot was his cousin and he wanted to protect Pellot. Gonzalez admitted that he had been given use immunity and that he had testified for the State.

¶ 19    During redirect testimony, Gonzalez clarified his testimony about Vilayhong's window. He admitted that he did not tell police that Vilayhong had raised his window, and he noted that the police had not asked him any questions about Vilayhong's window.

¶ 20    Pellot testified that he was in the Expedition because he was spending time with his cousin, Gonzalez. At the time of the shooting, Pellot did not know Vilayhong, he had known defendant for less than a year, and he did not know that defendant belonged to a gang. Pellot asserted that

he could not remember much from the night of the shooting because he was intoxicated and had blacked out by the time the group left the convenience store and began following the rival gang members. Pellot could not remember who had been driving the Expedition, but he did remember that defendant was seated next to him, on his left, and in the third row of seats—not in the front passenger seat.

¶ 21 Pellot's in-court testimony was impeached with a February 2, 2009, recorded statement he made to the police. In the statement to police, Pellot stated that he had known Vilayhong for more than a year, had known defendant for over two years, and was aware that defendant was a member of the Maniac Latin Disciples. Pellot also knew that Perez-Gonzalez was driving the Expedition, and he had placed defendant in the front passenger's-side seat, not the third row. Pellot also described Vilayhong's and defendant's roles in the shooting to the police, stating that Vilayhong demanded that defendant shoot and, when he did not comply quickly enough, Vilayhong demanded the weapon. Pellot told police that defendant said that he would perform the shooting, and then defendant shot.

¶ 22 As he was confronted with the statement during his direct testimony, Pellot acknowledged that he had made it, but he explained that he fabricated the statement based on information he was told to provide. On cross-examination, Pellot asserted that he made the 2009 statement while he was in custody at the juvenile detention center on an unrelated matter. Pellot explained that he was questioned by two officers, and neither his parents nor an attorney was present.

¶ 23 Pellot further explained that, before giving his 2009 statement to the police, he had spoken with Gonzalez. Pellot maintained, however, that he did not remember much from January 30, 2009, because he had been drinking a lot of alcohol and using cannabis. Pellot did remember, nevertheless, that defendant sat next to him in the third row of the Expedition.

¶ 24 During the State's redirect examination, Pellot was asked to confirm that, although he could remember virtually nothing from the night of January 30, 2009, he nevertheless had an "explicit" memory that defendant was seated next to him in the third row of the Expedition. Pellot confirmed that recollection.

¶ 25 James Lalley, the lead investigator for the Rodriguez murder and a sergeant with the Elgin police department, testified that, the day following the shooting, defendant was arrested. Defendant admitted his presence at the convenience store but refused to identify any companions. During the questioning, defendant eventually identified Perez-Gonzalez as owning the Expedition. Defendant stated that, after he left the convenience store, he got into the rear seat of the Expedition. Defendant acknowledged seeing rival gang members across the street but claimed that nothing occurred. Defendant eventually admitted to hearing two loud booms. When the police asked defendant for the identity of the shooter, he asked for his parents.

¶ 26 The jury returned a general verdict of guilt, but it answered in the negative a special interrogatory seeking a sentencing enhancement for personally discharging a firearm that caused the victim's death. Defendant was sentenced to a 35-year term of imprisonment. Defendant's conviction and sentence were affirmed on direct appeal. *Rosalez I*, 2016 IL App (2d) 140431-U.

¶ 27 B. Defendant's Postconviction Petition—First and Second Stages

¶ 28 On October 25, 2017, defendant, who was represented by counsel, filed his postconviction petition. Defendant raised two claims: actual innocence and ineffective assistance of appellate counsel. Defendant included affidavits from himself, Vilayhong, Perez-Gonzalez, and Garza to support his actual-innocence claim.

¶ 29 Vilayhong's affidavit essentially repeated his trial testimony, except he identified himself as the shooter. In addition, Vilayhong averred that he instructed the group that, if they were contacted by the police, they were to identify defendant as the shooter.

¶ 30    Perez-Gonzalez provided two affidavits: one handwritten and one typed and signed. Perez-Gonzalez's affidavits also provided the general contours of the offense, but with Vilayhong as the shooter, and included the averment that Vilayhong instructed the group to identify defendant as the shooter. Perez-Gonzalez also averred that his contemporaneous statements to police were lies due to his personal knowledge and fear of Vilayhong. Perez-Gonzalez also averred that he decided not to testify at defendant's trial despite a favorable plea agreement because he did not want to participate in helping to prosecute the wrong person as the shooter.

¶ 31    Garza provided an affidavit that differed from the contemporaneous statements he gave to the police. Garza told police that, before the shooting, he had seen defendant with a gun, that he met with both defendant and Vilayhong about the gun, and that defendant admitted to Garza that he was the shooter. In the affidavit, Garza averred that those statements were not true and that he met with only Vilayhong. In addition, Garza averred that, on the night of the shooting, he met Vilayhong at a fast-food restaurant, and Vilayhong told him that he had gotten into an altercation with rival gang members and shot at the rivals' car; Vilayhong also told Garza to identify defendant as the shooter. The next day, Garza again met Vilayhong who asked him to dispose of a gun, and Vilayhong reiterated that, if asked, he was to identify defendant as the shooter. Garza explained in the affidavit that he did not tell police the truth due to his fear of Vilayhong which prompted him to move to Texas. When Garza returned to Illinois, he had been approached by a private investigator and provided the information in the affidavit.

¶ 32    Defendant also provided an affidavit which explained why he could not procure the evidence of actual innocence any earlier. Specifically, defendant averred that he received the discovery in his case indicating that Vilayhong, Perez-Gonzalez, and Gonzalez all identified defendant as the shooter, and, according to his trial counsel, the three, as State's witnesses, would not be available to defendant at trial to testify truthfully that Vilayhong was the shooter. Defendant

also explained he was unaware until postconviction counsel informed him that Garza possessed information helpful to defendant. It was not until 2015 that defendant's trial counsel sent a letter to defendant's parents that some of the witnesses in defendant's case were willing to recant their testimony. Trial counsel, however, did not respond to the inquiries from defendant's family, and they retained postconviction counsel for defendant.

¶ 33    The trial court advanced defendant's petition to the second stage, and the State moved to dismiss the petition. The trial court dismissed the petition reasoning that the information was not newly discovered (except the averments that Vilayhong ordered the others to identify defendant as the shooter—the court deemed that information to be newly discovered). Alternatively, the court determined that the affidavits were not of such conclusive character that, when considered with the evidence from the trial, they would probably lead to a different result. The court also rejected defendant's claim of ineffective assistance of counsel.

¶ 34    Defendant appealed and this court reversed the trial court's dismissal on the issue of newly discovered evidence and advanced that issue to the third stage. *Rosalez II*, 2021 IL App (2d) 200086, ¶ 87. We also rejected defendant's claim of ineffective assistance. *Id.*

¶ 35        C. Defendant's Postconviction Petition—Third Stage Evidentiary Hearing

¶ 36    On remand, the matter was advanced to a third stage evidentiary hearing on the issue of whether defendant was the shooter in the Rodriguez murder. On March 11, 2022, the hearing commenced.

¶ 37    Garza testified that, at the time of the hearing, he was 30 years of age, he was employed as a restaurant manager and consultant, and he was pursuing a degree in accounting and management. Garza was no longer involved in any gangs.

¶ 38    In January 2009, Garza was 16 years old and a member of the Maniac Latin Disciples. At the time, he was living in his brother's house in McHenry County. During the evening of January

30, 2009, Vilayhong called Garza, urgently requesting that Garza pick him up at a Wendy's restaurant in Hoffman Estates. Garza explained that he obeyed Vilayhong because he was a leader in the gang and was quick to anger and quick to beat anyone who disagreed with him.

¶ 39 Garza drove his car, a white Honda Civic, to the rendezvous. Vilayhong came out of the restaurant with Pellot and Gonzalez. All three got into Garza's car. Vilayhong told Garza that the group had gotten into a confrontation with rival gang members, and he shot at their car. Vilayhong also instructed Garza to identify defendant as the shooter if anyone asked. Garza drove each of the three to their homes.

¶ 40 The next afternoon, Garza and Vilayhong met in Elgin; no others were present at the meeting. Garza described Vilayhong's demeanor as having changed from the night before and seemed to be more nervous and fearful. Vilayhong gave Garza a gun and instructed him to get rid of it. Vilayhong related that he had shot someone, and he was aware the police were investigating, so Garza needed to dispose of the gun. By this time, Garza was aware that the police were going to gang members' houses and that a woman had been killed.

¶ 41 Garza testified that, a couple of days later, Elgin police officers came to his brother's house and asked about the shooting. Garza denied any knowledge, explaining that he was afraid of the consequences to him and his family if anyone heard that he had given any information to the police. The officers showed Garza pictures of the woman who was shot and tried to get him to say that defendant was the shooter. The police were "very aggressive" with Garza and told Garza's family that he was involved in the offense, which angered Garza and prompted him to demand they leave "because it wasn't true at all."

¶ 42 Garza estimated that, about a week later, he learned he was being charged with a crime. Garza obtained counsel and surrendered himself at the Elgin police station. After a day in juvenile

detention, on February 6, 2009, Garza was released from custody and placed on electronic home monitoring at his parent's house in Elgin.[1]

¶ 43    On June 22, 2009, Garza entered a negotiated plea of guilty as a juvenile offender to the misdemeanor charge of attempted obstruction of justice. According to Garza, his attorney and the prosecutor reached a deal, and he had little input. However, to get the deal, Garza maintained that he had to agree to implicate defendant, even though that was not true. Under the agreement, Garza was placed on court supervision for a term of 24 months, and he was allowed to move with his parents to Texas on the condition that he would return to Illinois if needed to testify.

¶ 44    At the June 22, 2009, hearing, Garza was questioned by both his attorney and the prosecutor, and the examination consisted of mostly leading questions. Garza denied knowledge of the whereabouts of the gun used in the shooting and maintained that he learned about the shooting on January 31, 2009, when defendant revealed his involvement in the shooting. Garza characterized the factual basis of the plea as the police believing that Garza knew where the gun was located, and Garza denying any knowledge. The State clarified that Garza spoke to defendant about the shooting and defendant admitted that he and the group in the Expedition were involved in the shooting. The trial court further clarified that the factual basis for the attempted obstruction charge was Garza providing information to the police that the State believed to be untrue.

---

[1]Garza also testified that, at the time of his release from juvenile detention, his car was burned in the driveway of his parents' home. The police appear to have suggested to Garza that the car fire was the gang sending a message and attempting to intimidate him. The court sustained the State's objection to this line of inquiry.

¶ 45  After pleading guilty, Garza moved with his family to Texas. Garza explained that his family was afraid to remain in Elgin, and they remained in Texas until about 2015, when they returned to Elgin to care for an ailing relative.

¶ 46  In July 2017, Garza prepared an affidavit recounting the information to which he had testified. Garza decided to submit the affidavit after defendant's sister contacted him and asked whether he was willing to provide an affidavit about his involvement in the Rodriguez shooting. Garza was happy about the contact because "it was an opportunity to kind of do the right thing." Garza prepared a typed affidavit that he prepared using a form he found online. He signed it and had it notarized at a currency exchange. Garza testified that the affidavit was truthful, neither defendant's sister nor anyone else had told him what to include in his affidavit, and he received neither threats nor promises to induce him to provide the affidavit. After he completed the affidavit, he gave it to defendant's sister.

¶ 47  In October 2017, Garza was contacted by Kai Joy, a private investigator working on defendant's case. They met and Garza provided additional details to Joy. Joy then prepared a second affidavit containing this additional information. No threats or promises were made to Garza in exchange for the October 2017 affidavit.

¶ 48  Garza explained that, in 2017, he was willing to provide information about defendant's case because he knew that Vilayhong was imprisoned which relieved his fear of retaliation. Garza also maintained that he provided the affidavit out of a sense of guilt, and that his guilt over implicating defendant finally outweighed his fear at that time.

¶ 49  During cross-examination, Garza testified that he was essentially without a present memory of the June 2009 plea hearing. He admitted that he had lied under oath during that hearing, but he maintained that the statements in his affidavits and his current testimony were true. Thus,

Garza denied meeting defendant on January 31, 2009, and he denied seeing defendant with a gun two weeks before Rodriguez was murdered.

¶ 50    Garza maintained that, when he was interviewed by the Elgin police at his brother's home, the police told Garza's family that he had been present at the shooting, he knew about the shooting, and he was involved, all of which was not true.  Garza disagreed that the police were interested only in locating the gun; rather, the police wanted Garza to "jump on the band wagon and point fingers" to support their theory of the incident.  Garza also denied saying, "Fuck her," when the police showed him pictures depicting Rodriguez after she had been murdered.  Garza explained that he said something along the lines of, "Fuck that," to indicate that he did not want to look at the pictures of the deceased Rodriguez.  In addition, Garza agreed with the State that, when he was being questioned by defendant's counsel, his memory of the June 2009 plea hearing was markedly better than when he was answering the State's questions.

¶ 51    Perez-Gonzalez testified that, as of the hearing, he was 31 years of age and was serving a 45-year term of imprisonment in connection with the instant case.  In 2009, he lived in Elgin and worked as an assistant manager at a Popeyes restaurant.  Perez-Gonzalez was not involved with gangs.  In 2009, he was enrolled in classes at Elgin Community College.  He was childhood friends with defendant.

¶ 52    On the evening of January 30, 2009, Perez-Gonzalez was at defendant's family's home in Elgin.  Vilayhong and Gonzalez came over.  Perez-Gonzalez agreed to drive them all to a party.  Perez-Gonzalez was driving his mother's car, a white Ford Expedition.  As they proceeded to the party, he picked up Pellot, and the group stopped to buy beer at a convenience store.  As they left the lot of the convenience store, Vilayhong directed him to drive past a gas station across the street to investigate the presence of rival gang members.  Perez-Gonzalez was driving, defendant was in the front passenger's side seat, Vilayhong was in the seat behind defendant, Gonzalez was in the

seat behind him, and Pellot was in the third row. Perez-Gonzalez followed Vilayhong's instructions and Vilayhong leaned out of his window and started taunting the rival gang members.

¶ 53 Perez-Gonzalez believed that Vilayhong "had a beef with" the rival gang members; nobody else in the Expedition was yelling or saying anything—only Vilayhong. Vilayhong directed Perez-Gonzalez to follow the rival gang members as they left the gas station. Perez-Gonzalez noted that he was afraid of Vilayhong and knew him to be a high-ranking member of the Maniac Latin Disciples street gang.

¶ 54 Vilayhong directed Perez-Gonzalez to draw even with the Grand Prix, and Vilayhong fired a shot into it. Before shooting, Vilayhong had ordered defendant to take the gun, but defendant refused. After the shooting, Vilayhong directed Perez-Gonzalez to drop off defendant at his home and then to take the remaining occupants to find a car wash and to clean the car to remove any evidence, such as gunpowder residue. Vilayhong cleaned the Expedition at a car wash in Bolingbrook. Vilayhong then called his friend, Garza, to pick him up at a nearby restaurant. As they drove to the restaurant, Vilayhong instructed the group to identify defendant as the shooter. At that time, the group was not aware that Rodriguez had been killed. After dropping off Vilayhong, Gonzalez, and Pellot at the restaurant, Perez-Gonzalez drove to his home alone.

¶ 55 The next day, Perez-Gonzalez was arrested while he was driving the Expedition. He gave a videotaped statement. Perez-Gonzalez testified that he told the police everything that happened that night except the identity of the actual shooter. Instead, he falsely identified defendant as the shooter. Perez-Gonzalez was given a public defender, and he agreed to plead guilty to first-degree murder and aggravated discharge of a firearm. If he agreed to testify against defendant, he would receive a 20-year sentence, but if he did not testify against defendant, he would receive a 35-year sentence.

¶ 56     About a year later, Perez-Gonzalez's lawyer visited him in the county jail. Perez-Gonzalez had never met the public defender now assigned to his case. The lawyer wanted to discuss defendant's upcoming trial. Perez-Gonzalez told his lawyer that he would not testify at defendant's trial. Perez-Gonzalez was then brought before a judge, and he persisted in his refusal to testify. He was held in contempt of court. He understood that, because he would not testify at defendant's trial, he would be required to serve the 35-year sentence. Later, he received a 10-year sentence for contempt of court to be served consecutively, for an aggregate sentence of 45 years.

¶ 57     Perez-Gonzalez testified that, on December 27, 2016, he drafted a handwritten affidavit providing a truthful account about the events of January 30, 2009. Perez-Gonzalez discussed what had prompted him to make the affidavit. From December 2016 to May 2017, he and defendant were both incarcerated in the same prison. Perez-Gonzalez would see defendant in passing, but he never had the opportunity to sit down and talk to him. Perez-Gonzalez explained that "it was the opportune time [because] finally we're in the same spot together where everything could get clarified pretty much. I could help him and do right by him."

¶ 58     Defendant's counsel asked Perez-Gonzalez to elaborate on his motivation to now help defendant. Preez-Gonzalez stated:

> "I could've taken the easy way out as [Vilayhong] did and just put the bur- —you know, put the blame on him and go from there and do my lit- —you know, 20-year time, but it wasn't the truth. You know, it—he was not the shooter. He didn't do anything, just in the car. So I'm just trying to do right by him."

¶ 59     According to Perez-Gonzalez, he never spoke to defendant about the affidavit, rather, he drafted it and then gave it to defendant. Defendant did not pressure or threaten him to provide the affidavit, and defendant did not tell him what to include in the affidavit.

¶ 60    After providing the handwritten affidavit, investigator Joy met with Perez-Gonzalez to provide a type-written affidavit. Joy reduced the information Perez-Gonzalez provided to writing and, on February 28, 2018, Perez-Gonzalez reviewed the affidavit, made corrections he believed to be necessary, and signed it. Perez-Gonzalez asserted that the information in the February 2018 affidavit was truthful, and he was never pressured to provide the affidavit.

¶ 61    On cross-examination, Perez-Gonzalez was questioned about his statements to the police in which he identified defendant as the shooter. The police questioning began on January 31, 2009, around noon and concluded on February 1, 2009, at approximately 10:30 p.m. After the initial 30 minutes of the interviews, the remainder was recorded with Perez-Gonzalez's knowledge and consent.

¶ 62    Perez-Gonzalez's interviews implicated Vilayhong in the Rodriguez shooting. Perez-Gonzalez expressed fear of Vilayhong and how Vilayhong might retaliate if he learned that Perez-Gonzalez was cooperating with police. Perez-Gonzalez revealed that Vilayhong seemed nervous, and he removed his hat and sweater and placed them in Perez-Gonzalez's car after the group had dropped off defendant.

¶ 63    During breaks in the questioning, Perez-Gonzalez was allowed to call his mother, but, during the third stage hearing, he denied having any memory of the calls. In the calls to his mother, Perez-Gonzalez told his mother that her car was in front of the police station, and the police were investigating it. Perez-Gonzalez explained to his mother that he was driving the car and defendant took out a gun and shot someone. Perez-Gonzalez told defendant to get out of the car and then went to the Stratford Square Mall to clean the car before returning home. Perez-Gonzalez explained that, while he had no recollection of the conversations with his mother, he would not have told his mother the truth for two reasons. First, Perez-Gonzalez was aware of Vilayhong's status with the Maniac Latin Disciples and was afraid of potential retaliation against his mother

and brother if Vilayhong learned of his cooperation. Second, Perez-Gonzalez testified that he was aware that he was being recorded and so he was not free to tell his mother a different story from the one he was telling the police.

¶ 64    The cross-examination turned to Perez-Gonzalez's plea agreement. The State emphasized that the agreement contemplated truthful testimony from Perez-Gonzalez at defendant's trial, meaning that "such truthful testimony would be consistent with [Perez-Gonzalez's] final videotaped statement to the police given the day after the murder." Perez-Gonzalez clarified this on redirect examination, asserting that he could not have identified Vilayhong as the shooter at defendant's trial while still receiving the plea agreement's 20-year sentence.

¶ 65    The State, still on cross-examination, explored Perez-Gonzalez's averment in his handwritten affidavit that, "For a long time I held a grudge against [defendant] so I wanted him to feel the same pain I felt for having to do all this time." Perez-Gonzalez explained that, while he did not hold defendant responsible for Perez-Gonzalez's choices, defendant and defendant's friends created the situation in which Perez-Gonzalez found himself that night. Perez-Gonzalez believed that the only reason he had gang members in his car was because of defendant's association with them. Perez-Gonzalez further explained that, as time passed, he realized the pointlessness of holding a grudge against defendant, and, eventually, he decided to do the right thing and provide an accurate account of the events of Rodriguez's murder.

¶ 66    Vilayhong next testified. Prior to his testimony, in a letter dated July 12, 2021, Vilayhong declared that he was recanting his previous affidavits recanting his trial testimony. In another letter dated December 17, 2021, Vilayhong reiterated his recantation of his previous recantation. In the December 2021 letter, Vilayhong asserted that he had provided the 2018 affidavits due to pressure and threats by defendant against his then girlfriend, and he asserted that Pellot, Garza, and Perez-Gonzalez had fabricated their recantations pursuant to defendant's instructions in an

attempt to "redeem themselves [with] the gang." Finally, Vilayhong announced his intention to return to his trial testimony.

¶ 67    At the third stage hearing, defendant requested permission to treat Vilayhong as a hostile witness. The trial court denied defendant's request because the fact that a witness's testimony was damaging to a party or a witness was unsympathetic to a party's case was insufficient to show hostility; rather, the witness must be shown during testimony to be hostile, uncooperative, or unwilling.

¶ 68    At the hearing, Vilayhong testified that he was serving a 20-year term of imprisonment for his involvement in Rodriguez's murder, and he expected to be released in 2029. In 2009, Vilayhong was the governor of the Maniac Latin Disciples street gang, meaning, in his words, "I'm in charge."

¶ 69    Vilayhong was examined regarding the creation of his January 2018 affidavit. Vilayhong testified that, before signing it, he had multiple meetings with defendant's investigator, Joy, and one meeting with one of defendant's attorneys. Vilayhong maintained, however, that many statements in the affidavit were incorrect and that other statements, such as, that he instructed the others to identify defendant as the shooter, were fabricated by Joy. Vilayhong further maintained that he only signed the affidavit under duress.

¶ 70    Vilayhong stated that threats had been directed at his then-girlfriend, whom he had met through a prison pen-pal program. Vilayhong explained that she had been receiving threats from "defendant's people" demanding that Vilayhong recant or else she and her daughter would be harmed. It was this pressure that caused Vilayhong to sign the January 2018 affidavit.

¶ 71    Vilayhong also admitted that, in 2014 or 2015, he had written a letter to defendant's trial counsel expressing in interest in recanting. In the letter to defendant's trial counsel, Vilayhong represented that he was the shooter, not defendant.

¶ 72   Vilayhong testified that he told Joy that he was being threatened, but Joy refused to discuss the threats. Vilayhong, in his December 2021 letter recanting his recantation, asserted that Joy was participating in the scheme to threaten and pressure him to recant his trial testimony.

¶ 73   Vilayhong was confronted with letters he had written to Joy. In a February 2021 letter, he asked Joy about the progress in defendant's postconviction proceedings. In November 2021, Vilayhong wrote to Joy in which he stated that he looked to Joy as a mentor and asked whether Joy would either call him or visit him in prison.

¶ 74   Around November 2021, Vilayhong received a letter from Joy stating that there were developments in defendant's case and requesting a visit. In a letter dated November 2, 2021, Vilayhong responded, stating that he neither wanted Joy to visit nor to talk with him about defendant's case. Vilayhong explained his change of heart occurred because, after becoming aware that defendant's postconviction petition had been advanced to the third stage, he contacted his attorney and discussed the ramifications of recanting his trial testimony on his plea deal, specifically if it could result in a lengthier sentence and perjury charges, because he was aware of the consequences Perez-Gonzalez incurred when he refused to testify at defendant's trial.

¶ 75   Joy testified that, at the time of the hearing, he had been a private investigator for 24 years and, in May 2017, began working on defendant's case. In 2018, Joy visited defendant in prison. For the first visit, Joy was accompanied by one of defendant's attorneys. Joy initially confirmed that Vilayhong had written a letter to defendant's trial counsel, and he established that Vilayhong, despite some reservations, was willing to move forward and recant his trial testimony (in which he identified defendant as the shooter). Joy visited Vilayhong twice more. During the second visit, Vilayhong provided the information contained in the affidavit. Joy created the typewritten affidavit and, on his third visit, reviewed the affidavit with Vilayhong line by line. Vilayhong then signed the affidavit, which was also notarized.

¶ 76    Joy recalled that Vilayhong averred in the affidavit that he was not threatened or promised anything to sign the affidavit.  Joy also testified that he did not mention his then-girlfriend or that she had been threatened.  Rather, Vilayhong expressed concern that signing the affidavit could affect his sentence or expose him to charges of perjury.  Joy refused to give him counsel, but he told Vilayhong that he had never seen anyone be charged for providing an affidavit.

¶ 77    Joy maintained contact with Vilayhong after completing the affidavit.  He sent Vilayhong articles on meditation, holiday greeting cards, and letters.  Joy testified that Vilayhong responded, always with a friendly tone.  In a November 2021 letter, Vilayhong expressed appreciation to Joy for his guidance, and stated that he looked on Joy as a mentor.  Around this time, Joy learned that this court had advanced defendant's postconviction petition to the third stage, and he wrote to Vilayhong, seeking to schedule a meeting.  Vilayhong immediately responded that he did not want Joy to visit or to discuss the case.

¶ 78    Joy also obtained affidavits from Perez-Gonzalez and Garza.  When he learned that Garza's car had been set on fire, he obtained the reports from the Elgin fire department, and he verified that the car was registered to Garza.  Joy related that the fire department report included that the responding officers from the Elgin police department suggested that the car fire may have been gang related.

¶ 79    Following the testimony of Garza, Perez-Gonzalez, Vilayhong, and Joy, the State moved for a directed finding.  The trial court denied the motion.

¶ 80    The State called two witnesses for the hearing.  Tom Wolek, a detective with the Elgin police department, testified about Perez-Gonzalez's interviews.  He confirmed that, except for the first half-hour, all of Perez-Gonzalez's interviews were recorded, and the recordings and partial transcripts of the interviews were introduced into evidence.  On cross-examination, Wolek

acknowledged that Perez-Gonzalez was aware he was being videotaped while he was in the interview room and, in fact, had consented to the recording.

¶ 81    Lalley testified that, on February 2, 2009, he and Wolek interviewed Garza at the home of Garza's brother in McHenry County. Garza told the detectives that, on the night of the shooting, he had picked up Vilayhong, Gonzalez, and Pellot at a Wendy's restaurant on Route 20 and dropped them off at another location. Lalley denied that he suggested that Garza was present in the vehicle during the shooting. Garza told the detectives that, when he picked up the group, Vilayhong stated that they had gotten into a dispute with some people and they "had to handle business." Garza also stated that, later, he met Vilayhong and defendant. Lalley was uncertain precisely when this meeting between Garza, Vilayhong, and defendant occurred, but he believed it was the next morning. Garza related that the meeting concerned hiding or disposing of the gun used in Rodriguez's murder. Vilayhong and defendant argued over how to handle the gun and ignored Garza's suggestions; eventually Garza offered to assist in hiding the gun. Garza did not want to tell the detectives what happened to the gun because he did not want to implicate other people. Lalley brought Garza's family members into the room to have them assist in getting Garza to reveal the gun's location. "[Wolek] put [the photos] in front of [Garza] just imploring [Garza] that this was an innocent person who was killed. [Garza] immediately looked at the photos, and he stated, 'Fuck her.' "

¶ 82    Defendant cross-examined Lalley about a report he authored based on the interview with Garza (interview report), and a document he authored charging Garza with unlawful use of weapons and obstruction of justice (charging document).[2] Defendant established on cross-examination that the charging document alleges that Garza visited defendant's home to pick up

---

[2]Neither document appears in the record on appeal.

the gun used in Rodriguez's murder, but the interview report does not include this information. Despite the inconsistency between the two documents, Lalley maintained that Garza himself provided the information that defendant obtained the murder weapon from Garza's home.

¶ 83    On December 6, 2022, the trial court entered its written order denying petitioner's postconviction petition.  The court initially recounted the materials it considered in reaching its decision: "the relevant pleadings, testimony, exhibits and affidavits admitted at the evidentiary hearing, as well as considering all of the oral arguments made during the hearing, case law submitted the written closing arguments, and the trial transcripts in this case."  Next, the court set forth the principles it would use to guide its review.  The court also noted that:

> "Three witnesses who testified on behalf of [defendant] submitted affidavits that contradicted either prior testimony or in the case of Perez-Gonzalez, prior video and audio-recorded statements ***.  Garza and Perez-Gonzalez recanted prior information they had given about the murder.  [Vilayhong] testified at [defendant's] trial that [defendant] was the shooter.  [Vilayhong] then recanted his trial testimony in his affidavit dated 1/19/18 (see 3d stage hearing Def. Ex. #7).  When called to testify at this third stage hearing on April 20, 2022, [Vilayhong] then recanted his recantation."

¶ 84    The trial court then turned to its analysis of the testimony of Garza, Perez-Gonzalez, and Vilayhong.  First the court tackled Garza's testimony.

¶ 85    The trial court detailed the inconsistencies between Garza's 2009 testimony under oath before the juvenile tribunal and his affidavits and 2022 testimony under oath during the third stage hearing.  The court noted the varying versions of Garza's testimony about the gun used in Rodriguez's murder. Specifically, the court recounted that, in Garza's "original" version, to which he testified under oath to the juvenile court during his juvenile plea hearing, Garza learned of the shooting the next day, January 31, 2009, and he met with Vilayhong and defendant to discuss

disposing of the gun. He offered to take the gun and told police that he had taken the gun but refused to tell police the location of the gun.

¶ 86    In his juvenile plea hearing, Garza expressly denied that he touched or possessed the gun in any way. In his 2017 affidavits, Garza stated that he met Vilayhong on the night of the shooting, January 30, 2009, and learned about the incident. Garza also averred that, the next day, he met with Vilayhong alone and, rather than volunteering to dispose of the gun, Vilayhong ordered him to dispose of it.

¶ 87    Garza admitted to lying under oath. In addition, he changed his testimony about when and whether he met with defendant regarding the shooting. Likewise, Garza originally told police and testified under oath that defendant told him he was the shooter, but in the third stage hearing, Garza recanted these statements under oath. Similarly, Garza changed his testimony about disposing of the gun, and admitted lying to the police while they were investigating its whereabouts.

¶ 88    The trial court also discussed in detail the issue of the destruction of Garza's car:

> "The Court is giving very little weight to [defendant's] evidence regarding a car fire at [Garza's] house being gang related. There was one line in the report which stated 'EPD on scene and indicated the fire may have been gang related.' That is it. Additionally, Garza did not bring this fire to the attention of [defendant's] attorneys until the day or two before he testified. The Court can infer that this incident was not lodged in Garza's memory as a scary threat or act of intimidation. [Defendant's] own investigator agreed that it was speculative as to whether the fire of the car was gang related." (Internal record citations omitted.)

¶ 89    The trial court then determined that Garza was not credible and listed its reasons:

> "He has admittedly lied under oath.
>
> He admitted lying to the police during the investigation of this murder.

He had a very poor memory while answering questions about his prior testimony by the State.

He had a very good memory while answering questions about his prior testimony by [defendant's] attorney.

His memory was poor.

His memory was selective.

His manner while testifying was that he appeared very eager to please.

He testified at the third stage hearing that his guilt outweighed his fear by the time he came forward. If Garza's guilt outweighed his fear at some point, why didn't he do something about it at that exact point in time when his guilt outweighed his fear? What was that point? He did not recant his story until [defendant's] sister contacted him. He made no effort to contact [defendant] to apologize for his lies. That in itself lends suspicion to his recantation. He waited until two years until [*sic*] after he moved back to the Elgin area before he gave any new information.

He did not mention anything about a burning car until shortly before he testified.

Garza was a member of the Maniac Latin Disciples at the time of this murder. The court can infer that when he spoke to the police, he was trying to protect all of his fellow gang members, including [defendant], Manith Vilayhong, and himself.

[Defendant] did not present any evidence to corroborate that Garza was told what to say during his plea testimony back in 2009. His attorney, Mr. Gibbs, is still a practicing attorney in this area.

Garza has given many inconsistent statements relating to this murder, he has lied under oath, he has recanted under oath, he has given different versions of events while under oath in 2009 and while under oath in 2022.

Garza was a fellow gang member of [defendant] at the time of the murder. That gives him bias and a motive to fabricate his testimony and an interest in helping [defendant] obtain a new trial."

¶ 90    The trial court next turned to considering Perez-Gonzalez's testimony:

"While there are several relevant things to discuss about the involvement of Perez-Gonzalez throughout this case, the most important aspect is his recantation of who shot and killed Paola Rodriguez on January 30, 2009. Shortly after the murder, he said [defendant] was the shooter. 8 to 9 [*sic*] years later, he said that [Vilayhong] was the shooter.

The court has reviewed all of the video and audio-recorded statements of Perez-Gonzalez. At the time he was in custody and gave these statements, he was very young. He was cooperative with the Elgin Police Department. He was taken into custody within eighteen hours after the shooting.

During the taped interviews, Perez-Gonzalez was confronted by the police about two areas where they thought he had not been forthcoming. One area was that there was a fifth person in the car ([Pellot]). The other was that he did not go to the car wash alone. [Perez]-Gonzalez immediately told the truth when the police confronted him. This was in People's Ex. 6.

Also in People's Ex. # 6, Perez-Gonzalez said that [Vilayhong] told him, 'You don't know nothing.' In People's Ex. # 8, Perez-Gonzalez said, 'I want this to be done the right way.' The court takes this to mean that he wanted to tell the police the truth about what happened. [Vilayhong] saying 'You don't know nothing' is much more believable that [Vilayhong] saying 'tell them [defendant] was the shooter.' Giving up a fellow gang member is not what gang members do. They keep silent.

Perez-Gonzalez also stated in these audio and videotaped statements in summary, and not verbatim, the following:

[Defendant] was the front seat passenger. [Vilayhong] told [defendant] to kill him. He never saw [Vilayhong] with the gun. Perez-Gonzalez said, this is not going to happen in my car. [Defendant] just rolled down the window, pulled out the gun, and shot him. After the shooting, he let [defendant] out of his [vehicle]. He knew it was a Glock. [Vilayhong] said you had better wash your car. He got a text message from [defendant]. [Defendant] fired once. He got home at 10:40 p.m. He was shaken up, that is why he said the other guys were not with him at the car wash. [Vilayhong] was in the front seat when they went to the car wash. [Perez-Gonzalez, Pellot, and Gonzalez] did not say anything. [Defendant] was shooting the gun.

Everything he told the cops was the truth. No one told him what to say. They used to hide guns on the back of [defendant's] porch.

Also quite telling are the transcripts in English of what Perez-Gonzalez told his mother when the police were out of the interview room. See People's Exhibits 2, 4, and Petitioner's Ex. 19. Perez-Gonzalez told his mother that [defendant] shot a kid, [defendant] took out a gun and shot a guy, he told [defendant] to get down from the van (bus). I'm going to be here until they get [defendant] because I told them he's the one who did it. He was with us and he's who did it.

The court finds the video and audiotaped statements of Perez-Gonzalez to be very compelling evidence in this third stage hearing. He told the police he wanted to get it right and he never said that anyone other than [defendant] was the shooter. His statement to the police appeared credible to the court.

To this day, the court does not have a clear understanding of why Perez-Gonzalez chose not to testify at [defendant's] trial. Part of his story was that he held a grudge against [defendant]. On 3/11/22, he testified that he was never mad at [defendant] (record citation). Perez-Gonzalez did not mention holding a grudge against [defendant] in his second affidavit. He blamed his fear of [Vilayhong] as the reason he did not testify.

In Paragraph 7 of his second affidavit, Perez-Gonzalez stated: 'At the time, I was afraid to tell the truth about what happened. [Vilayhong] was known as Crazy Tony and was a governor in the Maniac Latin Disciples. [Vilayhong] was known as an enforcer and had a reputation for being very violent. I knew how crazy [Vilayhong] could be. I was afraid of what could happen to me if I was truthful about him being the shooter.'

However, during his testimony at the third stage hearing, Perez-Gonzalez stated that he would have testified at [defendant's] trial that [Vilayhong] was the shooter but 'nobody ever came to me about it.' (Record citation.) This statement is unbelievable. He testified that he spoke with his attorney and told him or her that he was not going to testify. The Court does not believe that there was not a discussion as to why he made that decision. It makes no sense. More importantly, Perez-Gonzalez testified on cross-examination that he was no longer fearful that there would be anything done in 2012 by [Vilayhong] if he testified that [Vilayhong] was the shooter because his family was in Puerto Rico by then. He said he could have told his defense attorney that [Vilayhong] was the shooter at that time and not [defendant], but he chose not to.

[Perez-Gonzalez] stated that his family moved to Puerto Rico in September or October 2010. Also, in November 2011, when he was remanded to the Department of Corrections, he let go of his grudge against defendant.]

This statement by Perez-Gonzalez that he was no longer afraid of [Vilayhong] in 2011-2012 discredits his statements as to why he did not tell his 'new' truth at [defendant's] trial.

The court also found Perez-Gonzalez to be unbelievable when he testified on 3/11/22 about how it came to be that he wrote his affidavit recanting the initial information he gave to the police.

Perez-Gonzalez testified at the third stage hearing that he was in the same facility as [defendant] from the end of December 2016 until May 2017. He was asked if his conversations with [defendant] or seeing him had anything to do with this affidavit. (Record citation.) On the next page of the transcript, Perez-Gonzalez was asked if seeing [defendant] or having conversations with [defendant had] anything to do with his decision to write the affidavit and he responded, 'Yes, because it was the opportune time [because] finally we're in the same spot together where everything could get clarified pretty much. I could help him and do right by him.' (Record citation.) The court can infer from this statement that [defendant] and Perez-Gonzalez did discuss the affidavit, especially when Perez-Gonzalez testified that they were in [the same] spot to 'get everything clarified.' After he signed the affidavit, he gave it to [defendant] (record citation). In answer to the Court's question, Perez-Gonzalez said he did not have any conversation with [defendant] about the affidavit (record citation). The credibility of the recantation of Perez-Gonzalez is highly suspect as his affidavit was produced at the same time [defendant] and Perez-Gonzalez were in the same prison, 5 years after [defendant's] trial. Perez-Gonzalez testified that he no longer held a grudge against [defendant] after he went to IDOC on 11/8/11. Yet he did not write out an affidavit until he was with [defendant] in prison in 2017.

The court finds that the affidavits and recantation of Perez-Gonzalez are not trustworthy or credible. He has given many inconsistent statements regarding why he wrote the affidavits, if he did or did not hold a grudge against [defendant], and when he was no longer afraid of [Vilayhong]. His testimony about why did not tell his trial attorney about [Vilayhong] being the shooter was not credible. The most believable evidence that Perez-Gonzalez said in this whole case was that [Vilayhong] told him he didn't know anything (referring to the shooting). This evidence was in the videotaped statements given by Perez-Gonzalez to the police the day after the shooting. This is what an enforcer of a gang would say. It is much more believable than Vilayhong telling everyone involved to say that [defendant] was the shooter."

¶ 91 In contrast to its analyses of Garza's and Perez-Gonzelez's testimony, the trial court's analysis of Vilayhong's testimony was brief and echoed the parties' arguments that Vilayhong had thoroughly destroyed his credibility with his serial recantations:

"Mr. Vilayhong was not a credible witness at the third stage hearing. He testified at [defendant's] trial saying [defendant] was the shooter, recanted his testimony in an affidavit, then wrote to Kane County State's Attorney recanting his recantation, and recanted his recantation under oath on April 20, 2022. The court gives little weight to Mr. Vilayhong's testimony on 4/20/22."

¶ 92 The trial court denied defendant's postconviction petition. First, it noted that recantation testimony was regarded as inherently unreliable, supplying the foundation for granting a new trial only in an extraordinary circumstance. Next, it noted that an actual innocence claim, as defendant's, must consist of newly discovered evidence that is material and noncumulative, and, most importantly, must be of such conclusive character that it would probably change the result on retrial. With these principles outlined, the trial court reasoned:

"The evidence presented by [defendant] is not of such conclusive character that it would probably change the result on retrial.

If there [were] a new trial and Perez-Gonzalez decided to testify and stick with his recantation, this court believes that his video and audiotaped statements would come in as substantive evidence if a proper foundation were given. The court found Perez-Gonzalez to be much more credible in the statements he gave on 1/31/09 than on the statements contained in his affidavits and testimony given on 3/11/22.

Garza might not even be called as a witness by the State. If he were called by the defense at a retrial, his testimony would be highly suspect. He was not called in [defendant's] first trial.

Vilayhong never recanted his trial testimony under oath.

Two other eyewitnesses testified at [defendant's] trial. Jose Gonzalez and Jose Pellot. Jose Gonzalez testified consistently in his testimony at the preliminary hearing in the case and at his trial testimony. He has not recanted. His testimony remains that [defendant] had the gun and shot the one and only bullet into the car, which caused the death of Paola Rodriguez. Likewise, Jose Pellot has not recanted his testimony.

The court has assessed the credibility of the three witnesses related to this shooting by [defendant] and finds their recantations to be highly incredible.

The Court finds that the petition has not presented evidence that is so conclusive, when viewed with the trial testimony and evidence, that it would probably lead to a different result. The Court finds that [defendant] has failed to prove his claim of actual innocence by a preponderance of the evidence."

¶ 93    Defendant timely appeals.

¶ 94                                  II. ANALYSIS

¶ 95    On appeal, defendant contends that the trial court committed manifest error in denying his postconviction petition following a third stage evidentiary hearing. Defendant challenges the trial court's assessment of the new witnesses' testimony as flawed because it was based on outside-of-the-record considerations, particularly with respect to whether Vilayhong instructed them to identify defendant as the shooter. Defendant also challenges the court's evaluation of the testimony from the third stage evidentiary hearing as biased instead of fair and impartial. Last, defendant contends that the court used an incorrect standard to evaluate the conclusive character of the evidence. We address these contentions in turn.

¶ 96                                    A. Standard of Review

¶ 97    As an initial matter, the Act is intended to provide defendants with a remedy by which they may challenge their convictions or sentences for constitutional violations, so long as those violations were not and could not have been determined on direct appeal. *People v. Barrow*, 195 Ill. 2d 506, 518-19 (2001). Its purpose is distinct from a direct appeal and allows the defendant to collaterally attack the final judgment. *Id.* at 519.

¶ 98    The Act provides for a three-stage proceeding: in the first stage, the defendant must present the gist of constitutional claim, and the petition will advance to the second stage so long as it is not frivolous or patently without merit. *Rosalez II*, 2021 IL App (2d) 200086, ¶ 90. In the second stage, the defendant must make a substantial showing of a constitutional violation. *Id.* ¶ 91. In the third stage, the trial court conducts an evidentiary hearing to determine whether a new trial is warranted. *Id.* ¶ 92. For the third stage hearing, the court makes factual and credibility determinations. *Id.* The defendant is again required to make a substantial showing of a constitutional violation in order to establish his or her entitlement to a new trial. *Id.*

¶ 99    In this case, defendant's actual-innocence claim was advanced to the third stage of postconviction proceedings. Specifically, defendant contends that the affidavits and testimony of

Garza, Perez-Gonzalez, and Vilayhong consistently demonstrate that he was not the shooter and is therefore actually innocent of the offense for which he was convicted. *Id.* ¶ 130 (the State did not prosecute or convict defendant on an accountability theory; thus, if defendant can demonstrate that he was not the shooter, he has demonstrated actual innocence for purposes of his claim).

¶ 100 The trial court is required to determine if the evidence is new, material, and noncumulative. *People v. Coleman*, 2013 IL 113307, ¶ 96. We note the parties do not dispute any of these elements. Next, the court considers whether the evidence is conclusive, meaning that, when the new evidence adduced during the third stage hearing is considered along with the trial evidence, it would probably lead to a different result, and this is the most important element in an actual-innocence claim. *People v. Robinson*, 2020 IL 123849, ¶ 47. Practically, this means that the court must determine whether the evidence supporting the postconviction petition places the trial evidence in different light and undermines its confidence in the judgment of guilt. *Id.* ¶ 48. The new evidence need not be entirely dispositive for the court to conclude that the result would be different on retrial—probability, not certainty, is the watchword in considering whether the trier of fact would reach a different result when considering the trial evidence and the postconviction evidence together. *Id.*

¶ 101 At a third stage evidentiary hearing, the trial court acts as the finder of fact, and it resolves any conflicts in the evidence and determines the credibility of witnesses and the weight to be given their testimony. *People v. Harris*, 2021 IL App (1st) 182172, ¶ 49. Because the trial court sits in a better position to observe the witnesses' and parties' conduct and demeanor, we defer to the trial court and will not disturb its decision unless it is manifestly erroneous. *Id.* A finding is manifestly erroneous if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence. *Id.* With these principles in mind, we turn to defendant's contentions.

¶ 102      B. Credibility Assessment Based on Evidence from Outside of the Record

¶ 103   Defendant first argues that the trial court based its credibility assessment of the testimony of Perez-Gonzalez and Garza on information outside of the record and not on testimony and evidence adduced during the third stage hearing. Defendant's argument centers around whether the testimony that Vilayhong instructed the occupants of the Expedition to identify defendant as the shooter was believable. Defendant highlights two instances in the court's written decision in which it expressed doubt over whether Vilayhong would instruct the other occupants to identify defendant as the shooter because gang members "keep silent," and an "enforcer of a gang would say," to another member that "he didn't know anything (referring to the shooting)." Defendant also argues the inference drawn by the court that Garza was biased and motivated to help defendant receive a new trial because of their common gang membership was also based on evidence not contained in the record.

¶ 104   We agree with defendant that, if a trial court relies on evidence outside of the record in making a credibility determination, it results in error. *Id.* ¶ 54. However, we disagree that this occurred in this case.

¶ 105   Defendant overlooks that the recording of Perez-Gonzalez's 2009 interviews with police was entered into the record. Perez-Gonzalez told police that Vilayhong told him, "You don't know nothing," and was otherwise forthcoming when the police confronted Perez-Gonzalez about untruthful representations. The trial court found that this statement during the interviews with the police had the ring of truth and credited it (and the statements given during the interviews) as believable, while Perez-Gonzalez's testimony during the third stage hearing was incredible and unbelievable.

¶ 106   We note that the trial court discounted the credibility of Perez-Gonzalez's postconviction testimony for more than what it deemed an "enforcer of a gang would say." The court based its

determination on the way Perez-Gonzalez's explanations for recanting changed. In his first affidavit, Perez-Gonzalez represented that he did not come forward sooner because he held a grudge against defendant for involving him in the offense. In his second affidavit, his reticence was explained because of his fear of Vilayhong, and in his postconviction testimony, he testified that he was never mad at defendant. Also in his postconviction testimony, Perez-Gonzalez stated that he would have testified at defendant's trial, but nobody asked him, and that, as of the postconviction hearing, he was no longer afraid of any retaliation by Vilayhong. Regarding the latter point, the court noted that, well before defendant's trial, Perez-Gonzalez's family had moved to Puerto Rico and was thus safe from any retaliation by Vilayhong, which, according to Perez-Gonzalez's postconviction testimony, would have cleared the way for him to testify at defendant's trial.

¶ 107    Next, the trial court found that Perez-Gonzalez's denial that defendant had any influence over the creation of the affidavits to be facially incredible. The court noted that both defendant and Perez-Gonzalez were both incarcerated at the same institution, and Perez-Gonzalez testified that he was motivated to create the affidavit as "it was the opportune time [because] finally we're in the same spot together where everything could get clarified pretty much." Further, the court observed that Perez-Gonzalez's denial that defendant influenced him did not hold water where Perez-Gonzalez testified that he had contact with defendant. The court also discounted the credibility of Perez-Gonzalez's recantation[3] because of defendant's and Perez-Gonzalez's proximity in the same prison, the timing of the affidavit, and the fact that the affidavit was created some five years after defendant's trial despite Perez-Gonzalez's testimony that he no longer held

---

[3]Defendant disputes whether Perez-Gonzalez "recanted" because he did not testify at defendant's 2012 trial. We address this contention below.

a grudge against defendant when he was incarcerated in 2011 and thus had no reason to delay in giving his current version of events.

¶ 108    Finally, the trial court determined that Perez-Gonzalez's testimony at the third stage postconviction hearing was neither trustworthy nor credible because of Perez-Gonzalez's many, many inconsistent statements. The court noted that Perez-Gonzalez had given inconsistent statements on a myriad of topics, ranging from his reasons for producing the affidavits, his feelings toward defendant and how and when they evolved or changed, his feelings about Vilayhong and how and when they changed, and his reasoning for not telling anyone, including his attorney, that Vilayhong, not defendant, was the shooter. Instead, the court concluded that Perez-Gonzalez's contemporaneous statements to police in his 2009 recorded interviews were, in fact, credible and trustworthy, and this conclusion was based on observing both the recorded interviews and Perez-Gonzalez's live testimony at the third stage postconviction hearing.

¶ 109    We thus conclude that the trial court based its credibility determination on the record and not solely, as defendant attempts to represent, on its belief about "what an enforcer of a gang would say." We further emphasize that court's determination regarding the relative credibility of Vilayhong commanding silence versus Vilayhong commanding that defendant be identified as the shooter is based on evidence of record, namely, Perez-Gonzalez's contemporaneous recorded statements to police. Defendant's contention, therefore, is rebutted by the record and the trial court's thoughtful and thorough analysis.

¶ 110    In similar fashion, defendant suggests that the trial court's inference that, because Garza was a member of the Maniac Latin Disciples, "he was trying to protect all of his fellow gang members" when he spoke to the police is based on the court's personal beliefs about what a gang member would do. This, too, is directly rebutted by evidence in the record.

¶ 111   In the third stage postconviction hearing, Lalley testified about his questioning of Garza in Garza's brother's home in McHenry County.  Lalley related that Garza expressly refused to divulge the location of the gun used to murder Rodriguez because "it could possibly implicate four to five other people in some sort of criminal activity."  Lalley further related that Garza did not want to be seen as a snitch, and revealing the location of the gun was almost a moral dilemma for Garza because of the possible harm to fellow gang members who may have been implicated and because he would be "a snitch."

¶ 112   Defendant highlights the trial court's judgment in which the court stated, "The court can infer that when [Garza] spoke to the police, he was trying to protect all of his fellow gang members, including [defendant], Manith Vilayhong, and himself."  However, Lalley's postconviction testimony clearly relates to and supports the court's inference that Garza was trying to protect fellow gang members.  Defendant's contention is rebutted by the record.

¶ 113   Defendant cites *Harris* for the unexceptionable proposition that a trial court commits error where it relies on evidence outside of the record in making a credibility determination.  *Id.* ¶ 54. *Harris* involved the trial court's determination that the case was a "heater case" despite no testimony to that effect inferred that, because of the notoriety of the case, the officers involved were less likely to have engaged in the physical abuse that the defendant was claiming.  In the trial court's view in that case, the notoriety of the case and the disincentive to bring more scrutiny to a heater case rendered the police officers' testimony denying the physical abuse more credible.  *Id.*

¶ 114   This circumstance, relying on matters outside of the record, is not present in our case.  The trial court's determination was based on an analysis of all the evidence of record.  The court's conclusions and inferences were grounded in that evidence.  *Harris*, while stating a correct rule of law that we here follow, is factually distinct from our case, and, therefore, it does not guide our determination.  Pursuant to the general rule in *Harris*, we conclude that the trial court did not rely

on evidence or other matters outside of the record in determining that Perez-Gonzalez's and Garza's postconviction testimony was not credible. Accordingly, we reject defendant's contention that the trial court relied on matters outside of the record in determining witness credibility.

¶ 115                    C. Biased Evaluation of Postconviction Testimony

¶ 116 Defendant argues that the "circuit court's order denying post-conviction relief demonstrates clear bias in favor of the State." In support of this contention, defendant argues that the trial court's labeling of defendant's postconviction witnesses as "recanting witnesses" was a "wild exaggeration" because the label could only properly apply to a witness who repudiated prior sworn trial testimony. Defendant also disputes the court's interpretation, inferences, and conclusions about the facts adduced during the third stage postconviction hearing and contained in the record, such as the court's questioning of Perez-Gonzalez's credibility concerning the creation of his initial affidavit, how the court viewed Perez-Gonzalez's recorded phone calls to his mother from the interview room, and the court's minimization of events that defendant believes should have been given paramount weight. Defendant also disputes the court's resolution of factual issues, such as whether Garza stated, "Fuck that," or "Fuck her," when confronted with crime-scene photographs of Rodriguez. This fulfillment of its role as fact finder, according to defendant, demonstrates the court's implacable bias and closed-mindedness against him. We disagree.

¶ 117 It is notable that nowhere in defendant's argument is a discussion of the legal principles applicable to a trial court's role in a third stage postconviction evidentiary hearing. This omission is despite defendant's reliance on *Harris*, which held that the "circuit court acts as the finder of fact at the [third stage] evidentiary hearing, resolving any conflicts in the evidence and determining the credibility of witnesses and weight to be given their testimony." *Harris*, 2021 IL App (1st) 182172, ¶ 49. We perceive that the trial court's order here did just that: it discussed the conflicts

within the witnesses' testimony and with their prior statements, it resolved the conflicts and discussed how it arrived at those decisions, and it weighed the witnesses' testimony and resolved the issues before it.

¶ 118    Moreover, the purpose of a written order, among other things, is to facilitate appellate review by laying out its factual determinations and legal reasoning.  See, *e.g.*, *People v. Porter*, 122 Ill. 2d 64, 81-82 (1988).  When considered in conjunction with the manifest-error standard (*Harris*, 2021 IL App (1st) 182172, ¶ 49 (a court commits manifest error when "the opposite conclusion is clearly evidence or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented)), we believe that the trial court adequately documented how it conducted itself as the trier of fact.  The order is eminently sufficient and helpful to our review of its judgment which, after all, we review on appeal.  *E.g.*, *People v. Degrave*, 2023 IL App (1st) 192479, ¶ 59 (even under abuse-of-discretion review, the appellate court reviews the trial court's judgment, not its reasoning).

¶ 119    Defendant is also effectively repeating his initial argument, albeit slightly more broadly: he is attacking how the trial court fulfilled its role as finder of fact.  For the reasons expressed above, we reject this challenge.  In addition, we perceive that, under defendant's argument, to consider the evidence, the implicit standard of review would require the court to credulously accept any and all third stage testimony—effectively, defendant contends that everything his witnesses say now is the truth and everything they said before is a lie.  We also reject this implicit standard of review.

¶ 120    Turning to the specifics of defendant's argument, he first makes a semantical attack on the trial court's characterization that Perez-Gonzalez and Garza were recanting witnesses because a witness can only recant prior sworn testimony.  To "recant" means to repudiate or renounce a previous statement formally and publicly.  Webster's Third New International Dictionary 1873

(1993); Black's Law Dictionary 1274 (7th ed. 1999). It is appropriate to use dictionary definitions to ascertain the meaning of undefined statutory terms. *People v. Villareal*, 2023 IL 127318, ¶ 27. It follows that dictionary definitions can also be used to ascertain the common meaning of other terms, such as terms employed in court orders. See *People v. Lee*, 344 Ill. App. 3d 851, 855 (2003) (as with interpreting statutes and contracts, an appellate court reviews the order of the trial court to ascertain its intent, thus canons of construction to ascertain the meaning of the language employed may be used).

¶ 121 Moreover, recantation, testimonial or otherwise, bears on a witness's credibility. *People v Fillyaw*, 2018 IL App (2d) 150709, ¶ 60. The trial court, as finder of fact, considers and determines the credibility of the witnesses, including the circumstances and weight to be accorded their testimony. *People v. Steidl*, 142 Ill. 2d 204, 253-55 (1991) (in determining the weight to be given a witness's recanting testimony, the finder of fact can consider the conditions and circumstances under which the recantation was obtained). Here, the trial court considered the circumstances under which the recantations occurred, including the timing of the recantation, the proximity to defendant when the decision to recant was undertaken, the explanations concerning the truthfulness of the former statements versus the latter statements and the like. Accordingly, we reject defendant's limitation on the term "recant," and defendant's suggestion that Perez-Gonzalez's and Garza's recantations did not bear any sort of scrutiny is incorrect as a matter of law and logic. The trial court viewed the recanting statements as inconsistent with earlier, contemporaneous statements and appropriately fulfilled its duty as finder of fact in considering the credibility and assigning the weight to be given those statements.

¶ 122 Defendant also complains that, in *Rosalez II*, this court determined that Perez-Gonzalez's credibility was enhanced because he refused to testify at defendant's trial thereby losing the benefit of his plea agreement and earning a greater sentence. While it is true that Perez-Gonzalez did not

testify at defendant's trial, and this should be taken into account at the third stage determination, this court did not and could not consider any issues of credibility whatsoever in *Rosalez II*. *Rosalez II*, 2021 IL App (2d) 200086, ¶ 95 (in review of a second-stage dismissal, the reviewing court accepts as true all well-pleaded facts not positively rebutted by the record). Further, the trial court carefully considered the circumstance surrounding the creation of the affidavit, including the effect of not testifying at defendant's original trial. We thus reject defendant's contention that, by labeling Perez-Gonzalez a recanting witness, the trial court "brushe[d] aside evidence of the man's integrity in order to unfairly demean him as a recanting witness."

¶ 123    Defendant likewise focuses almost solely on whether Garza testified in court and concludes that his juvenile proceedings do not qualify as actual testimony for purposes of his incorrect definition of "recanting" because in the juvenile proceedings, Garza was asked leading questions by both the State and the attorney representing him. Defendant overlooks the fact that he gave statements to the police, and that he repudiated material facts from those statements in his affidavits and his testimony at the third stage hearing. As we have noted, the trial court was entitled to consider the circumstances that produced the change in position in making its credibility determinations. We reject defendant's contention that Garza ought not to have been deemed a recanting witness. The label of recanting witness fully applies to Perez-Gonzalez and Garza, and we find no issue with the trial court's labeling or analysis based on the characterization of Perez-Gonzalez and Garza as recanting witnesses.

¶ 124    Next, defendant argues that the trial court rejected Perez-Gonzalez's affidavit based on a determination that Perez-Gonzalez "colluded" with defendant in creating his affidavit. This argument is based on a misreading of the trial court's explanation.

¶ 125    In its order denying defendant's petition for postconviction relief, the trial court stated that it "found Perez-Gonzalez to be unbelievable when he testified on 3/11/22 about how it came to be

that he wrote his affidavit recanting the initial information he gave to the police." The court then explained why Perez-Gonzalez was unbelievable. Specifically, it noted that, in response to defense counsel's question whether "conversations [with] or seeing [defendant]" led to his decision to create his affidavit, Perez-Gonzalez answered, "Yes, because it was the opportune time [because] finally we're in the same spot together where everything could get clarified pretty much." Thus, Perez-Gonzalez admitted that he created the affidavit after conversations with and seeing defendant. Even if the court had expressly concluded that Perez-Gonzalez colluded with defendant over his affidavit, this testimony would support such a conclusion.

¶ 126 The trial court continued, noting that this testimony supports an inference that "[defendant] and Perez-Gonzalez did discuss the affidavit, especially when Perez-Gonzalez testified that they were in [a] spot to 'get everything clarified.' " The court further noted, that, despite Perez-Gonzalez's admission that "conversations [with] or seeing [defendant]" led to the creation of the affidavit, when the court itself asked Perez-Gonzalez whether he had any conversations with [defendant] about the affidavit, Perez-Gonzalez denied it.

¶ 127 The trial court expressly concluded that "[t]he credibility of the recantation of Perez-Gonzalez is highly suspect." To support that conclusion, not only did the court rely on Perez-Gonzalez's admission to "conversations [with] or seeing [defendant]," his testimonial inconsistency about his conversations with defendant, but also because Perez-Gonzalez's "affidavit was produced at the same time [defendant] and Perez-Gonzalez were in the same prison," and the timing when the affidavit was produced. The court noted that the affidavit was created five years after defendant's trial, yet Perez-Gonzalez explained in his affidavit that his silence about his new version of the events was due to a grudge against defendant for involving him in the shooting, while in the postconviction hearing, he testified that, when he was first incarcerated in November 2011, he no longer held a grudge against defendant.

¶ 128   We see, therefore, that defendant's characterization that the trial court rejected Perez-Gonzalez's affidavit solely based on a finding of collusion between Perez-Gonzalez and defendant is unsupported by the actual language of the court's order.  The court relied on the inconsistency of Perez-Gonzalez's third stage hearing testimony with the averments in the affidavit to question the believability of his recantation.  Accordingly, because the court's determination that Perez-Gonzalez's recantation was not believable was based on evidence in the record, we reject defendant's claim that it was "evidence-free" and indicative of the court's bias.

¶ 129   Defendant also argues: "Next the [trial] court finds it compelling that when Perez-Gonzalez spoke to his mother from the interrogation room, he told her that '[defendant] shot a guy.' "  According to defendant, this illustrates the trial court's bias because the court ignored "all of the evidence in the record that explains why Perez-Gonzalez would make this statement to his mother."

¶ 130   Defendant once again misrepresents the actual statements and reasoning of the trial court.  The court held that it "finds the video and audiotaped statements of Perez-Gonzalez to be very compelling evidence in this third stage hearing."  Defendant attempts to truncate the court's determination into just Perez-Gonzalez's phone calls to his mother.  While the phone calls to his mother are a part of the statements Perez-Gonzalez provided to police, the court considered all of the evidence: the statements to police, the affidavit, and the live testimony.  Defendant frames the issue as whether there is a reason Perez-Gonzalez would call his mother.  This misses the mark.  The issue, instead, is whether the court was justified in deeming the contemporaneous statements to police compelling, and defendant's framing simply begs the question.

¶ 131   Defendant also focuses on the effect of the testimony during the third stage hearing that, at the time of the offense, Perez-Gonzalez and Garza feared retaliation from Vilayhong if they identified him as the shooter.  According to defendant, the trial court's explanation as to why it

discounted this evidence illustrates its bias against him. Defendant overlooks that the court did not question whether it was reasonable for the witnesses to have been afraid of Vilayhong, rather, it questioned the credibility of the recantation when, as with Garza, the recantation came well after any fear of Vilayhong had dissipated. Garza did not recant immediately once his family was safe from Vilayhong, or immediately when he returned to the area, but he waited for two more years before he provided his recanting affidavit.

¶ 132   Defendant questions the trial court's determination to give little weight to the evidence that Garza's car was burned. According to defendant, this was a compelling reason for Garza to fear retaliation from Vilayhong and the gang. We note that the only evidence beyond Garza's testimony was a fire department report which included a hearsay representation that unnamed members of the police department thought that the car fire may have been gang related. Further, Garza did not tell defendant's attorneys about the incident until a day or two before the evidentiary hearing. While the trial court could have perhaps reached the conclusion defendant advocates, its determination is rooted in the record, and we cannot conclude it to be against the manifest weight of the evidence.

¶ 133   Last, defendant complains that the trial court unfairly determined that Garza said, "Fuck her," when shown a shown a crime-scene photograph of the deceased Rodriguez, and did not credit his testimony, in which he stated that he said his response to the photograph was "more like fuck that." According to defendant, this conclusion represents a microcosm of the court's "one-sided focus on reasons to disbelieve defense witnesses [and] suggests bias." We disagree. The court noted that Garza's testimony about the crime-scene photographs of Rodriguez was contradicted by Lalley's testimony. Bias might be an inference had there been no contradicting testimony. Here, however, it appears that the court was performing its duty as the finder of fact. Moreover, that there was contradictory testimony required the court to assess the testimony and assign the

appropriate weight to each. *Harris*, 2021 IL App (1st) 182172, ¶ 49 (the "circuit court acts as the finder of fact at the [third stage] evidentiary hearing, resolving any conflicts in the evidence and determining the credibility of witnesses and weight to be given their testimony"). Nothing in the record suggests otherwise.

¶ 134   Accordingly, for the foregoing reasons, we reject defendant's contention. We hold that, on this record, we cannot say that the trial court's resolution of the credibility, conflicts, and weight to be given the evidence reflects anything other than the performance of its duty as finder of fact and does not support a conclusion that the court was biased against defendant.

¶ 135      D. Erroneous Standard to Evaluate the Conclusive Character of the Evidence

¶ 136   In his final issue on appeal, defendant argues that the trial court "used an erroneous standard to evaluate the conclusive character" of the evidence presented at the third stage evidentiary hearing. As noted above, our supreme court held that, in analyzing the conclusive character of the new evidence, the court is to consider whether, when viewed along with the trial evidence, all the evidence together would probably lead to a different result. *Robinson*, 2020 IL 123849, ¶ 47. This means, in a practical sense, that the court must determine whether the new evidence places the trial evidence in a different light and undermines confidence in the original finding of guilt. *Id.* ¶ 48. This new evidence need not totally vindicate or exonerate the defendant; rather, the court must consider whether there is a reasonable probability that the trier of fact would reach a different result when considering the trial evidence and the postconviction evidence together. *Id.*

¶ 137   Defendant simply argues that "[i]t is clear from the lower court's opinion denying relief that [it] did not follow the above guidelines in evaluating the new evidence." While defendant does not identify the offending standard used by the trial court, we infer defendant is suggesting that the court here used the erroneous standard in *People v. Treondous Robinson*, 2021 IL App (1st) 171371, on which defendant relies. In that case, the trial court erred by considering the

evidence under a total vindication or exoneration standard. *Id.* ¶ 55. The *Treondous Robinson* court determined that the trial court's standard conflicted with our supreme court in *Robinson*, and held that, because the trial court used the wrong standard, the trial court's decision must be reversed, and the appropriate remedy was to order a new third stage hearing to allow the trial court to consider the evidence under the proper standard. *Id.* ¶¶ 56-58. Defendant's wrong-standard insinuation finds no support in the record. The trial court here prefaces its analysis with the correct standard: "The evidence presented by [defendant] is not of such conclusive character that it would probably change the result on retrial." Likewise, the court concludes: "The Court finds that [defendant] has not presented evidence that is so conclusive, when viewed with the trial testimony and evidence, that it would probably lead to a different result." These statements amply demonstrate that the court considered the evidence adduced during the third stage hearing and in the record employing the correct standard.

¶ 138 Defendant's contention is essentially *res ipsa loquitur*: because the trial court came to an adverse conclusion, it must have used the wrong standard. We disagree. After thoroughly discussing its reasons for determining that the postconviction testimony and Perez-Gonzalez, Garza, and Vilayhong was not believable, it then turned to consider whether its confidence in the verdict was undermined:

"To succeed on a theory of actual innocence in a post-conviction claim, the evidence produced by the [defendant] must be newly discovered, material and noncumulative. It must be of such conclusive character that tit would probably change the result on retrial. (Citation.)

If there [were] a new trial and Perez-Gonzalez decided to testify and stick with his recantation, this court believes that his video and audiotaped statements would come in as substantive evidence if a proper foundation were given. The court found Perez-Gonzalez

to be much more credible in the statements he gave on 1/31/09 than on the statements contained in his affidavits and testimony given on 3/11/22.

Garza might not even be called as a witness by the State. If he were called by the defense at a retrial, his testimony would be highly suspect. He was not called in [defendant's] first trial.

Vilayhong never recanted his trial testimony under oath.

Two other eyewitnesses testified at [defendant's] trial. Jose Gonzalez and Jose Pellot. Jose Gonzalez testified consistently in his testimony at the preliminary hearing in this case and at his trial testimony. He has not recanted. His testimony remains that [defendant] had the gun and shot the one and only bullet into the car, which caused the death of Paola Rodriguez. Likewise, Jose Pellot has not recanted his testimony.

The court has assessed the credibility of the three witnesses related to this shooting by [defendant] and finds their recantations to be highly incredible.

The Court finds that [defendant] has not presented evidence that is so conclusive, when viewed with the trial testimony and evidence, that it would probably lead to a different result. The Court finds that [defendant] has failed to prove his claim of actual innocence by a preponderance of the evidence."

We cannot say that the trial court used the wrong standard to consider the evidence. Likewise, we cannot say that the court's decision was manifestly erroneous.

¶ 139 Defendant contends that the trial court failed to properly assess the impact of the third stage hearing testimony on the trial evidence and what the result of a retrial would be. First, defendant argues that the trial court's statement that Vilayhong did not recant his trial testimony under oath means that Vilayhong could still testify for the State. To the contrary, the court recognized that Vilayhong submitted an affidavit recanting his trial testimony, and then repudiated the recanting

affidavit. In reaching its conclusion that a retrial would not probably have a different result, the court did not rely on Vilayhong's original testimony and properly so: Vilayhong's changing versions of the events from trial to the recanting affidavit to his postconviction testimony leave him without credibility, and any testimony at a retrial would be incredible and entitled to no weight.

¶ 140 Next, defendant disputes that the case for his guilt could rest solely on the testimony of Gonzalez and Pellot, as they did not recant. Gonzalez testified consistently at a preliminary hearing and at trial in this case. Gonzalez squarely places the gun in defendant's hand and identifies defendant as the shooter. The jury at the original trial was aware of the circumstances (testifying under use immunity) and inconsistencies between his first statements to the police and his trial testimony. In other words, none of the postconviction evidence changes how Gonzalez's testimony would be considered, and the trial court reasonably noted that fact. While Gonzalez's testimony alone is a slender reed upon which to find defendant guilty, it did not and does not stand alone.

¶ 141 Defendant discounts Pellot's testimony. The trial court also noted that Pellot did not recant from his trial testimony, but we note that, at defendant's trial, Pellot testified that he had blacked out. Pellot's trial testimony was impeached with his contemporaneous statements to the police that identified defendant as the shooter.

¶ 142 In addition, the trial court discounted Garza's postconviction testimony and concluded that, at a retrial, "his testimony would be highly suspect." On the other hand, the court determined that, with a proper foundation, Perez-Gonzalez's various recorded statements to police would be admitted as substantive evidence. The court deemed those recorded statements to be extremely credible and compelling. In those statements, Perez-Gonzalez identified defendant as the shooter. Thus, we cannot say that the trial court's determination of what would probably happen at a retrial was manifestly erroneous.

¶ 143   Defendant cites *People v. Lofton*, 2011 IL App (1st) 100118, for the proposition that the new evidence elicited during the third stage hearing identifying Vilayhong as the shooter is more consistent with the undisputed evidence than the evidence in the record identifying defendant as the shooter.  In *Lofton*, the defendant based his claim of actual innocence on the affidavit of one Walker, who was not involved in the defendant's original trial.  *Id.* ¶¶ 21-23.  Moreover, *Lofton* was an appeal from a second stage dismissal (*id.* ¶ 24) and is thus procedurally as well as factually inapposite.  Finally, we note that the trial court carefully analyzed the postconviction testimony of Garza, Perez-Gonzalez, and Vilayhong and found their testimony to be incredible, and this determination was not manifestly erroneous.  Thus, the evidence identifying Vilayhong as the shooter is not credible and we reject defendant's contention.

¶ 144   Defendant next discusses *Coleman*, 2013 IL 113307, ¶ 113, as an exemplar of the type of evidence that is conclusive enough to undermine the court's confidence in the conviction and would probably result in a different result in a trial before another trier of fact.  In *Coleman*, five witnesses who were involved in the offenses for which the defendant was charged came forward to state that the defendant was not involved in the offenses.  *Id.*  ¶¶ 102-06.  *Coleman*, however, does not involve recanting witnesses.  Thus, the consideration of five witnesses, not previously involved in the defendant's trial and all testifying that the defendant was not involved, carries significantly different weight than the recanting (and incredible) witnesses here.  *Coleman*, therefore, is inapposite.

¶ 145   Defendant also cites two cases apparently illustrating the idea of what evidence may be deemed conclusive enough.  These cases, too, are distinguishable.  Defendant cites *People v. Carballido*, 2015 IL App (2d) 140760, with the cryptic explanation that the trial court's denial of postconviction relief following a third stage hearing was manifestly erroneous.  *Carballido* involved the issue of the whether there is a reasonable probability of a changed outcome once the

State's discovery violation and related errors are placed before a jury. *Id.* ¶ 89. This is plainly distinguishable from evaluating the credibility and effect of recanting witnesses' testimony.

¶ 146 Defendant cites *People v. Galvan*, 2019 IL App (1st) 170150, ¶ 74, for the proposition that the new evidence adduced at the postconviction hearing was conclusive enough to probably change the outcome of a suppression hearing. *Galvan* centered around whether evidence of police officers' participation in systematic and methodical interrogation abuse would have impeached the officers' credibility during the motion to suppress. *Id.* The court held that the trial court's finding of incredibility was not related to the issue concerning the motion to suppress and held that the trial court's conclusion was manifestly erroneous. *Id.* Thus, in *Galvan*, the trial court's credibility determinations were not relevant to the issue of the outcome of a suppression hearing; here, by contrast, the trial court's credibility determinations are central to the issue of whether the new evidence considered with the trial evidence would probably result in a different outcome on a retrial. We therefore reject defendant's contentions.

¶ 147                                     III. CONCLUSION

¶ 148 For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

¶ 149 Affirmed.